# WHEELING.

## STATE *v.* FLANAGAN.

Submitted June 13, 1885.—Decided June 27, 1885.

1. An indictment for murder in the form prescribed by sec. 1 of ch. 118 of the Acts of the legislature of 1882 is a valid indictment. (p. 118.)

2. Upon a writ of error to a judgment overruling a motion to set aside a verdict and to award a new trial, on the ground that the verdict was contrary to the evidence, and the evidence and not the facts proved is certified in the bill of exceptions, the appellate court will not reverse the judgment, unless after rejecting all the conflicting parol evidence of the exceptor and giving full faith and credit to that of the adverse party the decision of the trial-court still appears to be wrong. (See *Black* v. *Thomas*, 21 W. Va. 709.) (p. 119.)

3. If a party be accused of crime and a conviction is sought upon evidence in whole or in part circumstantial, it is essential, that all the circumstances, from which the conclusion is to be drawn, and without which it could not be drawn, shall be established by full proof, and every circumstance essential to the conclusion must be proved in the same manner and to the same extent, as if the whole issue had rested upon the proof of each individual and essential circumstance. (p. 122 & 136.)

4. All such essential facts and circumstances, when established by full proof, must be consistent with the hypothesis of the guilt of the accused, and inconsistent with any other hypothesis; and it is essential, that all such facts and circumstances should be of a conclusive nature and tendency. (p. 122.)

5. If any of these essential circumstances be consistent with the hypothesis of the innocence of the accused, then that circumstance ought not to have any influence in establishing the main fact to be proved. (p. 136.)

6. It is a fundamental and inflexible rule of legal procedure, of universal obligation, that no person shall be required to answer or be involved in the consequences of guilt without satisfactory proof of the *corpus delicti* either by direct evidence or by cogent and irresistible grounds of presumption. (p. 123.)

7. On the trial of an indictment for homicide, although the body has been found, yet the *corpus delicti* can not be said to be proved, until it be established by full proof, that such death has not been caused by natural causes or accident. (p. 123.)

8. On the trial of such indictment when the remains of the alleged deceased have been found wholly or partly consumed by fire, it is necessary to establish by full proof, that the remains so found are the remains of the deceased, and this proof is a necessary part of the *corpus delicti*. (p. 133.)

9. On a trial for homicide, where the evidence is insufficient to establish the *corpus delicti*, there is no sufficient proof that a legal crime has been committed, and therefore no person can be legally guilty of the commission of it. (p. 123.)

The facts of the case are sufficiently stated in the opinion of the Court.

*A. B. Parsons* and *T. A. Bradford* for plaintiff in error.

*Alfred Caldwell*, Attorney General, and *C. H. Scott* for the State.

WOODS, JUDGE:

On May 23, 1884, John C. Flanagan was indicted in the circuit court of Randolph county for the murder of Frances Summerfield, on the — day of December, 1883.

The indictment was in the form prescribed by sec. 1 of ch. 118 of the Acts of the Legislature of 1882. To this indictment the defendant pleaded "Not guilty." The case was continued until the September term, when it was tried, and the jury on September 27, 1884, returned their verdict finding him guilty of murder in the first degree, and that he be punished by confinement in the penitentiary.

The defendant moved the court to set the verdict aside and grant him a new trial, on the ground that the verdict was contrary to the evidence, which motion the court overruled, and the prisoner excepted, and filed his bill of exceptions, wherein the court certified all the evidence which was before the jury on the trial, and entered a judgment upon the verdict, that the prisoner be confined in the penitentiary, during the period of his natural life. To this judgment the prisoner obtained a writ of error.

Four grounds of error are assigned by the prisoner's counsel, but all taken together, they amount in substance to this, that the verdict was not supported by the evidence. One of the prisoner's counsel suggests in his brief, that the indictment was insufficient, because it did not "fully and plainly inform the prisoner of the character and cause of the accusation against him." This question has been twice before this Court, and in both cases it has been held that an indictment in the form prescribed in sec. 1 of ch. 118 of the Acts of the Legislature of 1882 is sufficient, and we regard this as a settled question. *Schnelle* v. *State*, 24 W. Va. 767 ; *Smith* v. *State, Id.* 814.

The only remaining question is that presented by the pris-

oner's bill of exceptions, viz : Is the evidence sufficient to sustain the verdict ? It is evident upon inspection of the bill of exceptions, that while it purports to certify the *facts* proved, it amounts to nothing more than a certificate of the evidence given by the several witnesses at the trial. Whatever doubts may have heretofore existed as to the sufficiency of a bill of exceptions, which certifies all the evidence adduced at the trial instead of the facts proved thereby, it is now well settled that the appellate court, upon a bill of exceptions certifying all the evidence, will review the opinion of the trial-court in granting or refusing a new trial, on the ground that the verdict is contrary to the evidence, in all cases where it is not compelled to decide upon the degree of credibility to which the witnesses or any of them, were entitled; but that in all cases where the appellate court, in order to grant relief, is required to pass upon the credibility of the witnesses, it will decline to interfere with the verdict which has been approved by the trial-court, for the very good reason, that no certificate of the evidence, of witnesses whose testimony is conflicting, can afford the appellate court an opportunity of judging of the credibility of the witness, equal to that possessed by the court and jury which tried the cause. The testimony given by two witnesses when reduced to writing, may seem equally truthful, yet the conduct and demeanor of one of these witnesses before the jury may have convinced both court and jury that the witness was wholly unworthy of credit, while that of the other, may have carried conviction to the mind of every one who heard his testimony. In all cases therefore where the appellate court is asked to determine the degree of credibility, to which the witnesses are entitled, it will decline, because it is unable to do so. But in cases where the evidence, and not the facts, is certified, the appellate court will review the opinion of the trial-court granting or refusing a new trial on the ground that the verdict is contrary to the evidence, whenever the court by excluding all the conflicting parol evidence of the exceptor, and by giving full faith and credit to all the evidence of the adverse party can see that the verdict is plainly contrary to, and unsupported by the evidence. *Carrington* v. *Bennett*, 1 Leigh 340; *Ewing* v. *Ewing*, 2 Leigh

337; *Green* v. *Ashby,* 6 Leigh 135; *Rohr* v. *Davis,* 9 Leigh 30; *Slaughter's Administrator* v. *Tutt,* 12 Leigh 147; *Parly* v. *English,* 5 Grat. 141; *Vaiden* v. *Commonwealth,* 12 Grat. 717. This question, has been considered by this Court in the cases of *Smith* v. *Townsend,* 21 W. Va. 486, *Black* v. *Thomas, Id.* 709, and *State* v. *Thompson, Id.* 741. In the case last cited this Court laid down the rule in such cases to be, that, "where the evidence and not the facts is certified in the bill of exceptions, the appellate court will not reverse the judgment unless after rejecting all the conflicting parol evidence of the exceptor, and giving full faith and credit to that of the adverse party the decision of the trial-court still appears to be wrong." But the appellate court will not interfere with the verdict of the jury, on the ground that it is contrary to the evidence, merely because, if upon the jury it would, upon the evidence, have given a different verdict. To justify the court in granting a new trial, the evidence should be plainly insufficient to warrant the finding of the jury. *Grayson's Case,* 6 Grat. 712, and *Vaiden's Case, supra.* Applying these rules to the case under consideration, all evidence introduced by the prisoner, which is in conflict with that offered by the State must be disregarded. If therefore upon giving full faith and credit to all the evidence introduced by the State, and disregarding all evidence in conflict therewith, offered by the prisoner, the same was plainly insufficient to warrant the verdict, the judgment of the circuit court overruling his motion to set the same aside, must be reversed, otherwise, it must be affirmed.

All the evidence introduced by the State against the prisoner was circumstantial; and it is insisted by the Attorney General in argument, that the circumstances set forth in the bill of exceptions, are not only sufficient to establish the *corpus delicti,* but to fix upon the prisoner the crime of murder, and that he was induced to commit the crime "by a jealous woman who felt outraged by the conduct of her husband." It may be remarked here, that where a crime has been committed, and the accused has been proved either by direct or circumstantial evidence to be the guilty party, it becomes wholly immaterial to inquire what motive induced him to commit the crime; but when the perpetrator is unknown,

and an effort is made to fasten upon the accused the guilt of the crime, then the motive, which may probably have induced him to commit the crime, may become a matter of the most earnest inquiry, for if the alleged motive be such as usually leads to the commission of such a crime, proof of its existence in the mind of the accused before or at the time of the commission thereof may possibly in some degree, tend to connect the accused with it. But if on the other hand, there is a total absence of all motive to commit such a crime, or if a motive of a wholly different character is shown to have existed in the mind of the accused, these facts would tend to relieve the accused from the charge preferred against him. If one was found murdered, between whom and the accused a deadly feud had previously existed, and the destruction of the deceased would remove a hated and dangerous foe; or if the deceased was one from whose death great profit might accrue to the accused, and he was discovered under such circumstances, as gave him safe opportunity to commit such crime, a motive therefor might be found in the existence of such feud, or in the hope of such gains, tending to fix upon him strong suspicion of guilt; but if the deceased was the wife, or child, or the intimate friend of the accused, between whom and the accused none but the most friendly relations had ever existed; or if the deceased was one upon the continuance of whose life depended the welfare or happiness of the accused, and he was discovered under similar circumstances, the absence of all motive to destroy, or the existence of the motive to preserve the life of the deceased, would as strongly tend to relieve him from all suspicion of guilt. It is not to be denied that circumstantial evidence may afford the strongest possible proof of guilt, but in order to do this, the several circumstances relied on to connect the accused with the commission of the offence must be established by full proof, and they must each be of a conclusive nature and tendency, consistent with each other, with the hypothesis of his guilt, and inconsistent with that of his innocence.

In every criminal case the guilt of the accused must be established by full proof, that is, by evidence which satisfies the mind of the jury to the exclusion of every reasonable

doubt, and "neither a mere preponderance of evidence nor any weight of preponderant evidence is sufficient for the purpose unless it generate full belief of the fact to the exclusion of any reasonable doubt." 1 Stark. Ev. 478; 3 Greenl. Ev. sec. 29. As guides to the safe administration of justice in criminal cases where the guilt of the accused is to be ascertained and determined upon circumstantial evidence, courts and text-writers have laid down the following rules, which meet with our approval. "First. It is essential that all the circumstances from which the conclusion is to be drawn shall be established by full proof, and the party upon whom the burden of proof rests, is bound to prove every single circumstance which is essential to the conclusion, in the same manner and to the same extent as if the whole issue had rested upon the proof of each individual and essential circumstance."

"Second. All the facts and circumstances, when established by full proof must be consistent with the hypothesis of the guilt of the accused."

"Third. It is essential that the circumstances should be of a conclusive nature and tendency. Evidence is always indefinite and inconclusive when it raises no more than a limited probability in favor of the fact, as compared with some definite probability against it, whether the precise proposition can, or can not be ascertained. It is, on the other hand, of a conclusive nature and tendency, when the probability in favor of the hypothesis exceeds all limits of an arithmetical or moral nature. Such evidence is always insufficient where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true; for it is the actual exclusion of every other hypothesis, which invests mere circumstances with the force of proof. Whenever therefore the evidence leaves it indifferent which of sveral hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence can not amount to proof, however great the probability may be."

"Fourth. It is essential that the circumstances should to a moral certainty actually exclude every hypothesis but the one proposed to be proved." 1 Stark. Ev. 507–513, and 3 Greenl. supra; Commonwealth v. Webster, 5 Cush. 295. From these,

another rule results in criminal cases :—that the coincidence of circumstances tending to indicate guilt, however strong and numerous they may be, amounts to nothing unless the *corpus delicti*, the *fact that the crime* has been actually perpetrated, be established by full proof,—for so long as the least reasonable doubt exists as to the *act*, there can be no certainty as to the agent.

It is a fundamental and inflexible rule of legal procedure, of unusual obligation, that no person shall be required to answer, or be involved in the consequences of guilt, without satisfactory proof of the *corpus delicti*, either by direct evidence or by cogent and irresistable grounds of presumption, for where there is no sufficient legal proof of crime, there can be no legal criminality. *Rex* v. *Burdett*, 4 B. & Ald. 123, Wills Cir. Ev. ch. 7, sec. 1. This principle requires that upon a charge of homicide even when the body has been found, and although indications of a violent death be manifest, it shall still be fully and satisfactorily proved, that the death was neither occasioned by natural causes, by accident, nor by the act of the deceased himself. 1 Stark Ev. 513.

While the discovery of the body necessarily affords the best evidence of the fact of the death, and the identity of the individual, and most frequently also, the cause of the death, yet in such cases the *corpus delicti* can not be said to be proved until it be fully and satisfactorily proved that such death was not caused by natural causes, accident, or by the act of the deceased. Wills Cir. Ev. p. 207; 3 Greenl. Ev. sec. 30; 1 Stark. Ev. 573.

The prisoner at the bar, John C. Flanagan is charged with the wilful murder of Frances Summerfield. This charge divides itself into two principal questions, to be resolved by the proof: First, whether Frances Summerfield came to her death by an act of violence inflicted by any person ; and secondly, if she did, whether that act was committed by the accused ? Under the first head we are to enquire and ascertain from the evidence in this record, whether Frances Summerfield is actually dead ; and if so, whether the evidence is such, as to exclude beyond reasonable doubt the supposition, that her death was occasioned by accident or suicide, and to show that it must have been the result of an act of violence,

To resolve these questions let us examine the evidence set forth in the prisoner's bill of exceptions. It will be unnecessary to recite all the evidence offered on the part of the State, and from the rule we have laid down we are compelled to reject all the evidence offered by the prisoner which conflicts with that offered by the State. Giving full faith and credit to the evidence offered by the State, it appears that Frances Summerfield, a single woman, who had never been married, before and on the 16th of December 1883, with her illigitimate child then about two years of age, was living on the farm, and in a house belonging to Job H. Parsons, on the east side of the top of Rich Mountain, about three hundred yards from the public road, and about one mile from his residence which was on the west side of the top of said mountain; that the house in which she lived was a log house, about sixteen or eighteen feet square, built two or three years before that date, with one door and one window, the door on the north, the window on the south side, and a chimney built of rock at the west end of the house; that three of the State's witnesses testified that the chimney was *about as high* as the house; another that it was not as high as the house, and another, that it was an *old chimney to which the house had been built ;* that on Thursday, December 13, the prisoner had been at the house of the State's witness David B. Wyatt surveying; that on the next day he again came to his house, and left about one o'clock, P. M. of that day, having borrowed said witness's gum coat, as it was raining, and wore it to the house of said Parsons where he stayed all night, and all the next day, mending his children's shoes and feeding his stock, until four or five o'clock in the evening, when he left the house, and some time after dark on the same evening, went to the house of Frances Summerfield with whom he spent the night, leaving her house about three o'clock on Sunday morning, December 16, 1883, and went in the direction of his home, which by the shortest route was eleven miles distant from her house, and by the route he said he traveled, it was seventeen or eighteen miles; that he reached his home about the first " chicken crow " on Monday morning, December 17, 1883, and remained there until he attended the coroner's inquest on the following Sunday, when he was arrested and committed to jail; that Frances

Summerfield and her child spent nearly all day of Sunday December 16, 1883, at the house of her cousin Aaron White, who lived about one quarter of a mile from her house, and left late in the evening, but afterwards returned to get fire; that on Monday morning December 17, 1883, said White arose *two or three hours before day*, looked east and west and it was very light; it was snowing and blowing, could see things all around it was so light; his wife got up and saw the light; it was so bright she could see fences, and bushes, and the bulk of the stable that stood near the burnt house, but could not see the house on account of a little ridge; his wife thought it a light in the sky; said to her husband, " Can it be possible that it is Frances Summerfield's house?" and he said "no, as they could see no sparks or smoke;" that on Sunday, December 16, the State's witness Ray, was returning from Pendleton county, with the wagon and team of Parson and a load of corn for him; came up the east side of Rich Mountain, and was overtaken by nightfall, just opposite the house of Frances Summerfield, where he turned out and fed his horses, except the one ridden by himself, and another which was ridden away by the witness Lambert who lived with said Parsons and who had come to meet the load of corn, and he left the wagon in the road; that after Lambert left, Ray rode up to the house of Frances Summerfield, and asked to stay all night with her, and she refused; that he heard a child crying in the house, and after feeding the stock below the house, returned by the house, he saw a light through the window, he then went to his own house, about a mile north of the residence of Parsons; that early on Monday morning December 17, 1883 he returned for the wagon load of grain left the evening before, by way of Parsons' house.   Saw Lambert there, and traveled the public road to the place he had left the wagon, but saw no tracks except one horse track made by one of his team horses that had come over in the night; considerable snow had fallen in the night; that when the wagon was left on Sunday night the snow was three or four inches deep, and on Monday morning the snow was at least a foot deep, and tracks made by the loaded team the night before were completely obliterated; but if tracks had been made after twelve o'clock on Sunday night, they would

not have been more than "half snowed up," if made before
that they would have been entirely "snowed up." It further ap-
pears that the fact that the house of Frances Summerfield was
burnt, was first discovered about eight o'clock on Tuesday
morning, December 18, 1883, by Noah Jordan and John
Summerfield both of whom were examined on the part of
the State. The material part of the testimony of Jordan is,
that about eight o'clock in the morning of December 18,
1883, he and John Summerfield started on foot to Collett's
store, and to go a near way, they went by the place where
Frances Summerfield's house had stood. When they got
near the place they discovered that it was burnt down, noth-
ing remaining but the naked chimney; that they saw in the
ashes of said house the burnt remains of a small person whom
they thought was said Frances Summerfield, about three feet
from the hearth, her head lying toward the window; that he
took hold of a leg and it broke off about the knee; that he
saw her head and teeth, and he took hold of her head and it
fell to pieces; that the bed stood twelve or fifteen feet from
the fireplace in one corner of the house; the lock lay about
three feet from the door when it was shut, and the bolt was
out as if it had been locked, and a crow-bar was lying a little
back from the middle of the house; the hinges lay imme-
diately below where they had been screwed to the door and
the facing, and they were closed up, as they would be when
the door was shut; that witness and John Summerfield were
the *first persons* that were at the spot after the house was
burnt, and although there was a deep snow on the ground,
there were no tracks or indications that any person had been
there before them; that after leaving the burnt house about
two hundred yards, he saw depressions in the snow a little
way at a time, but he could not tell, whether they were low
places in the ground or the tracks of man or beast. John
Summerfield, who was with the witness Jordan when the burnt
house was first discovered, testifies that he and Jordan were
the first persons at the burnt house; that he saw the remains of
a person lying on the right side, left arm extended; the skull
was whole except from the eyes up, it seemed to be broken
or burned up; a crow-bar lay about the middle of the house;
the lock lay about three feet from the door; that neither

witness nor Jordan picked up the lock; did not at that time see the remains of the child; saw no tracks of anything about the house place; that as he passed up the path towards the top of Rich mountain after they got into the woods, they saw "dents" in the snow; could see them on up to the public road in places only, but could not tell what they were; the snow was nearly knee deep; witness was the first to discover the remains of the dead child; they were found where they said the bed had stood; that the fore part of the child's head seemed to be broken up while the hinder part of the head seemed to be whole; and that a pot lid lay near the remains.

Lafayette Elza, another witness for the State testified, that he was at the inquest, saw the burnt remains of the woman; saw some dry blood in one side of her heart, and in both sides of the child's heart; there was no flesh upon or about the remains of the woman; all was consumed by fire except the heart, the liver and "the lights," some portions of the entrals, and what appeared to be some roasted flesh about the chest, as though the person had had a breast or breasts; the remains of the child were entirely consumed; the front part of its head seemed to have been broken in. He further testified that on December 3, 1883, he helped Job W. Parsons butcher a sheep at Frances Summerfield's; that witness got one quarter of it, and the remainder he salted in a trough and put it on the loft, and placed the crowbar under the side of it to keep it from turning over, and after the house was burned the crowbar lay about two or three feet from where it would have laid had it fallen perpendicularly down; that witness was one of the guards that conducted the prisoner from the inquest to the jail at Beverley, that on the way there, they stopped at the house of David B. Wyatt for prisoner to write a letter home; that while there he heard prisoner say, that "it he had to suffer, others would have to suffer with him." Witness did not hear all the conversation, but they were talking on the charge against the prisoner. Another witness heard the prisoner at the inquest say, that he wanted his father and brother Eben sent for; that they would satisfy the jury that he had stayed all night on Sunday night at his brother Eben's; that prisoner seemed to think he was ac-

cused—and said : " If this charge caused him trouble others would see trouble with him;" that witness could *not tell exactly* how it was said, but it was *about* that way; that every one was trying to find out who knew anything about the burning; the prisoner said a good deal there but witness can not remember all he said.    Another witness for the State testified that he was the constable, who summoned the prisoner as a witness to attend the inquest; that prisoner attended the inquest, that after the inquest was over, he took the prisoner to jail at Beverley; that on the way to Beverley prisoner said that " it seemed his best friends had turned their backs on him; that some of them had sworn wrong against him; that if he had to suffer innocently, things would be revealed that would make people open their eyes;" that at the time witness summoned the prisoner to attend the inquest as a witness, he had in his pocket a warrant for his arrest, but he did not inform him of it; that he summoned the prisoner as such witness on Friday after the burning.

The State's witness Lambert, who lived with Job W. Parsons, who had gone out on Sunday evening, December 16, 1883, to meet Ray with the load of corn, further testified on behalf the State, that after he had left Ray and the wagon in the road, as he passed up Rich mountain on his way to said Parsons, while on the east side of the top of the mountain, about three hundred yards from the top, and fifteen or twenty steps below the path that led down to Frances Summerfields, he met a man dressed in dark clothes, with a dark overcoat and a *medium sized hat*, whom he took for the defendant, John C. Flannegan; that he bid him the time of night and the man did the same; that he had seen the prisoner three times before; that Sunday night was snowy and there was no moon, but the snow gave some light; that he was not well acquainted with the prisoner, knew him when he saw him, that he recognized him by the sound of his voice; witness admitted that at the inquest over the remains, he swore, that from his partial acquaintance with Flanagan, he could not recognize his voice, but when Flanagan came to the inquest, and said " Good morning, gentlemen," he *thought it like the voice* he had heard on the mountain that Sunday evening; and that he never took any thought about his voice until he came to the inquest.

Emma Schmithey, another witness on behalf of the State, testified that she was living at Job W. Parsons in December, 1883; that on Saturday, December, 15, 1883, the prisoner was at Parson's mending shoes, and left there that evening. He was there on the preceding Thursday. He wanted paper. Mrs. Parsons gave him some. She *thinks* she saw the prisoner there on Sunday afternoon following, in the kitchen, and he went from the kitchen into Mrs. Parson's room; he did not stay very long as I saw, *if he was there at all.* Mrs. Parsons was in the room all the afternoon, except that she was out three or four times; that she was also out of her room several times during the forenoon, and she came in one time and sat close to the fire and said she was almost frozen; that witness was in Mrs. Parsons' room with Miss Knutti and the children reading to them; that there was no fires in the house except in Mrs. Parsons' room, and in the stove; Mrs. Parsons built a fire in the stove to get dinner and told witness to read to the children; that the witness was then *twelve* years old. Mrs. Parsons is post-mistress; the mail comes and goes each way twice a week; that witness *cannot say for certain* that the prisoner was at Parsons' on Sunday evening, but *thinks he was;* that she *just thinks* prisoner was *there on Sunday* and she cannot tell *why she thinks so.*

Emanuel White and A. S. Rogers were also examined by the State. White testified that last fall (1883) the prisoner told him, at David P. Wyatts, that he heard that Mrs. Job W. Parsons had said, that she would give $50.00 to see Job W. Parsons and Frances Summerfield together, and if he knew the money was sure, she could see them together; and witness further stated that he had heard the same rumor about the $50.00. Said Rogers testified that one or two weeks before the Summerfield house was reported burnt, he met the prisoner in the public road at Red Creek; that he did not recognize the prisoner until he told him who he was; that they traveled together on horse-back about four miles and talked about the war and other matters; that prisoner said there were many loose women on Dry Fork, and that Frances Summerfield was one of that kind, and it was a shame that Job W. Parsons was keeping her on his place

because he had a nice woman for a wife, and if the thing was not stopped, something like the "Red Creek affair" would likely happen again; that witness understood the "Red Creek affair" was the burning up of some persons years ago; that witness had seen prisoner and talked to him but once before, and that was two months before that time.

Eben. Flanagan, the brother of the prisoner, examined as a witness for the State testified, that the prisoner came to his house on Monday morning, December 17, 1883, about seven o'clock and borrowed some meal; that he was there again on Wednesday following in the afternoon, and before he went away, made a present to witness of a pistol, for which witness had previously offered him $5.00, and said that he would not sell it to anybody but would give it to witness, who told the prisoner that he would give him something for it, but prisoner said, "No, I may want a favor of you some time." Witness asked prisoner for a chew of tobacco and he gave him a piece and told him to keep it; that he saw the prisoner again on the next Friday at his own house, and he said to witness: "Have you heard the news?" Witness replied, "no, what news?" and prisoner then said that the word had come to him through his children from the school-house the evening before, that Fanny Summerfield and child were burnt up, and he supposed it was true because George W. Summerfield's children had brought the word to the school-house the day before; that witness went to chop wood for prisoner, who went away and after a while returned and told him by himself, a short distance from the prisoner's boy, where they were chopping wood, that constable Bennett had just summoned him as a witness to appear before the coroner's jury, and prisoner said, "they would be scouring the country to find out every man's whereabouts, and he told witness that if anybody enquired where he, the prisoner, was on Sunday night December 16, 1883, to tell them he stayed at witness's house on that night and to tell his father and witness's wife, and the prisoner's son, who was staying at witness's house, to tell the same thing if enquired of; that he wanted it understood that he stayed at witness's house that Sunday night;" that prisoner did not stay at witness's house that night; that witness testified before the coroner's jury on Sunday follow-

ing; that he was not allowed to talk to prisoner until Monday; that after witness had so testified and before he talked to prisoner he wrote to witness on a chip, " Did you state at your house on Sunday night?" and motioned for witness to come to him, and as witness passed by prisoner handed him the chip; that witness read it, and prisoner looked at him for an answer, and witness shook his head; that after the jury had rendered their verdict, prisoner took witness and his father around the house of G. W. White where the inquest was held, and remarked to witness: "By your not understanding me I am afraid you have got me in a bad box."

The gum coat borrowed by the prisoner from Wyatt on December 14, 1883 and worn by the prisoner on that day was produced on the trial, and two physicians who had examined it between the 15th of September 1884, and the time of the trial proved there were eight or ten drops of blood upon it, mostly on the right side and sleeve, and some on the left side and sleeve but they could not tell whether it was human blood or not; that they found a light golden colored hair wrapped around one of the buttons of the coat, and hanging down from four to six inches from the button; that the hair was lighter than that of the prisoner; and it was further proved by another witness for the State that Frances Summerfield had light hair, lighter than that of prisoner. Job W. Parsons was twice examined by the State and testified that he left home on Saturday morning December 15, 1883 and was in Grafton on the Monday following; that as he left home Saturday morning he went by Frances Summerfield's house, and stopped there; that the catch on the lock of the door was broken so that the door could only be held shut by locking; that there was a stone hearth to the fire-place about two feet wide; that he had a pistol, a five-shooter small, having a home-made rod to hold the cylinder, which he had found in the road; that the last time he saw it was on April 22, 1883, that he did not know it was gone until July following; that the prisoner came to witness's house late on Friday evening and asked to stay all night, and witness consented; that prisoner had on him a gum coat and he thinks light clothes; that witness does not feel kindly towards prisoner, and had helped to employ counsel to assist the prosecuting

attorney to prosecute him; that he wanted justice dealt out because his house was burnt; that witness had gone twice to see the prisoner's wife in search of evidence for the State since the prisoner was in jail, and had sent a written order by a sister of Frances Summerfield to the prisoner's wife for the gum coat, but did not get it; that he wanted it as an instrument of evidence for the State on the trial. The prisoner introduced various witnesses, who contradicted material portions of the testimony above recited, which under the rule laid down can not be considered. But he also introduced the testimony of other witnesses, showing that the gum coat had remained at prisoner's house until May 6, 1884, when it was taken away, and left at Mrs. Callott's, at Beverly, until September 15, 1884, when it was taken away from her by the sheriff of Randolph county, and left at the office of Dr. Yokum, where it remained until brought into court during the trial. David B. Wyatt who owned the coat testified on behalf of prisoner, that he had owned it for more than two years before he loaned it to the prisoner; had frequently lent it before that time to others, (or as he expressed it, to "Tom, Dick and Harry") until it was about worn out; that he had hunted squirrels and pheasants and killed them with that gum coat on, and carried them in his hand with his arm up over the gun when on his shoulder; that a short time before he lent the coat to prisoner, he lay by a 'coon tree until day light in company with his boy, who shot the 'coon, and that witness undertook to catch it as it fell to keep it out of the fire and from the dogs; that he failed to catch it; the 'coon falling about four feet from him, and the dogs got it and shook it around some time before he could get it away from them; that he either had that gum coat on upon that occasion, or it lay close by the fire near the place where the 'coon fell, and it bled a good deal, but he can not say whether blood got on the coat on these occasions or not. Mrs. Mary J. Parsons, the wife of Job W. Parsons, and Miss Knutti, were also examined as witnesses for the prisoner. Mrs. Parsons testified that the prisoner stayed at her house on Friday night, December 14, 1883, and left there on Saturday evening about four or five o'clock, and never returned, and was not there on Sunday, December 16, 1883; that he

had been mending shoes on Saturday for Miss Knutti and the children ; that Mr. Parsons was absent and witness got him to feed the cattle before he left on Saturday evening; that she has been post-mistress for eight or nine years past; that prisoner came to her house on Thursday, December 13, 1883, got some papers, wrote a letter and mailed it in her office. Miss Knutti testified that she was living at Parsons' during the month of December, 1883, and was at Parsons' house all day Saturday and Sunday, December 15 and 16, 1883; that prisoner left Parsons' on Saturday evening, December 15, 1883, about four or five o'clock; that he was not and could not have been at that house on Sunday, December 16, 1883, without her seeing him, for she was in every part of that house on that Sunday ; that he was mending shoes on that Saturday evening; and the last time she saw him on that evening, he was in the kitchen, where he got some apples and went away.

Applying to the evidence in this record the rules of law, which are hereinbefore laid down, the necessity and propriety of adhering to them become apparent.

The first great fact to be established in this case, without full proof of which no rightful conviction could be had is, that Frances Summerfield is dead ; for a conviction of murder is never allowed to take place until the body has been found or there is equivalent proof of death by circumstantial evidence to that result. The finding of the remains of a dead body, is not equivalent to finding the body of the person alleged to have been murdered, unless the remains be identified by full proof, which may also be supplied by direct or circumstantial evidence; for unless the remains be so identified, the party supposed to be dead may still be alive. Many lamentable instances in the history of judicial proceedings have occurred, where innocent persons have been tried, condemned and executed, for the murder of persons who suddenly disappeared and who afterwards were ascertained to be alive. Sir Matthew Hale on account of these cases says: "I will never convict any person of murder or manslaughter unless the fact were proved to be done, or at least the body found. 2 Pls. Cr. ch., 39 ; Wills Circum. Ev. 207. In the case under consideration the jury by their verdict necessarily

found that Frances Summerfield was dead, and that the burnt remains of one of the persons found in the ashes of her burnt dwelling, where she and her child were living the night before, were her remains, and we are of opinion that the jury from all the surrounding circumstances, detailed in this evidence, were fully warranted in finding that Frances Summerfield was dead, and that her burnt remains were found among the ruins of her dwelling.   Another important inquiry still remains to be answered: "Did she come to her death by an act of violence inflicted by any person ?   Does the evidence exclude beyond a reasonable doubt the supposition that her death was occasioned by accident?   If it does not, then the *corpus delicti* is not proved, and if not proved, then as we have already seen, however strong and numerous may be the co-incidences of circumstances to·indicate guilt, they will avail nothing; for so long as the least reasonable doubt exists, as to the criminal act, there can be no certainty as to the criminal agent.   1 Stark Ev. ; 5 Cush. *supra.*

So far from the evidence in this record excluding beyond all reasonable doubt, the supposition that Frances Summerfield came to her death by accident, it seems to us that all the surrounding circumstances indicate that she perished by the accidental burning of her dwelling house, and not by her own voluntary act, or by any act of violence inflicted by any other person.   She, with her little child lived alone in a little log house a quarter of a mile from her nearest neighbor— three hundred yards off the public road; the house built to an old chimney, how old, or how long disused before her house was built to it, does not appear; believed to be safe, but not reaching higher than the roof, perhaps not as high as the comb of the roof by two feet ; the house small, heated by one fireplace warming the whole house; the weather cold and stormy, no fire in it until late in the evening, then doubtless a large fire ; having had the prisoner with her all the night before, until three o'clock Sunday morning, she doubtless slept soundly; the door locked, as shown by its condition, and the condition of the hinges of the door when the ruins were first discovered ; snow three or four inches deep on Sunday evening; a foot deep on Monday morning, most of which had fallen before midnight on Sunday night,

and no tracks of man or beast, about or near the burnt house, on Tuesday morning, at eight o'clock when Jordan and Summerfield first saw them; all these facts tend to make it probable, nay almost certain, that her house had accidentally caught fire from the chimney, or from burning logs or embers rolling over the narrow hearth, and that awakened from her sleep she perished in the ruins of her blazing dwellng, either by being smothered by the flames or caught by the falling loft or rafters; or in the terror of the moment she may have even become so bewildered as to be unable to reach or unlock the door, and perished in the vain effort to reach the window. No sign of violence upon her remains was discovered, all were consumed except the heart, liver, lungs and a part of the entrails; the bones were burnt to cinders, the leg bone broke off about the knee, when lifted up, the skull was whole, except from the eyes up, it seemed broken up, or burned up, and when witness Jordon took hold of the head it fell to pieces; the presence of the crowbar, which was suggested in argument as the instrument with which the murder was committed, and which was found near the middle of house, is fully accounted for by the witness Elza, who on December 3, 1883 placed it under the trough, in which he had salted three quarters of a sheep, butchered there on that day, and which lay in the ruins within two or three feet from where it would lie, if it had fallen perpendicularly down, from where he then placed it. So far as this evidence shows, nothing that the prisoner ever had or owned, or that any other person ever had or owned, was found on or near the burnt premises—nor was anything ever had or owned by the deceased found on or near the prisoner or any other person. The precise time when this house was bunrt is not known, as it was not discovered until Tuesday morning December 18, 1883 about eight o'clock. The evidence however, of Aaron White and his wife would indicate that the the house was in flames on Monday morning December 17, 1883, two or three hours before day, which at that day of the month was between four and five o'clock in the morning.

Considering all these circumstances, and giving full faith and credit to the State's witnesses, we are of opinion they are insufficient to exclude the supposition that Frances Sum-

merfield perished by the accidental burning of her dwelling, and that they are insufficient to prove that she came to her death by any act of violence from the prisoner or any other person.

Nor is the force of this testimony in any degree strengthened by the other circumstances detailed by the State's witnesses, which were introduced for the purpose of connecting the prisoner with the alleged murder.

These circumstances, are—the presence of the prisoner at the house of Job W. Parsons on Sunday afternoon of the 16 of December, 1883; of being seen by the witness Lambert, on his way home that Sunday night from the place where the wagon load of corn was left in the road; the conversation had with the prisoner in the fall of 1883, by the witness Emanuel White, about the rumor in regard to the $50.00—; the conversation had with the prisoner by the witness Rogers; the blood and the hair on the gum coat; the statements of the prisoner at and after the inquest, "that if he had to suffer others would have to suffer with him," &c.; and the effort made by the prisoner to falsely make it appear that he had stayed at his brother Eben Flanagan's house on that Sunday night. All these circumstances are relied upon by the prosecution as sufficient to connect the prisoner with the alleged murder. Now if any one, or all of these circumstances be essential for that purpose, then it follows, that every such essential circumstance, must be proved in the same manner and to the same extent as if the whole issue had rested upon proof of that particular circumstance.

In *Commonwealth* v. *Webster*, 5 Cush. *supra.*, Shaw, C. J. delivering the opinion of the court, says, that "the several circumstances upon which the conclusion depends must be fully established by proof." They are facts from which the main fact is to be inferred, and they are to be proved by competent evidence, and by the same weight and force of evidence, as if each one itself were the main fact in issue. Under this rule every circumstance relied upon as material is to be brought to the test of strict proof. 1st Stark. Ev. 510. If any of the essential circumstances, the proof of which is necessary to establish the guilt of the accused, is con-

sistent with the hypothesis of his innocence, then that circum-
stance ought not to have any influence in establishing the
main fact to be proved. 3rd Greenl. Ev. sec. 29, note 2;
*Summers* v. *The State*, 5 Blackf. 579.

Whether the prisoner was at the house of Job W. Parsons
on the Sunday afternoon of December 16, as testified to by
the witness, Emma Schmithey; or was in the that neighbor-
hood on that Sunday evening, as testified by the witness Lam-
bert, is involved in doubt and uncertainty, and their testi-
mony is so greatly weakened when taken in connection with
that of the witness Mrs. Parsons and Miss Knutti, that if we
had been on the jury we might not have been able to concur
in their verdict, which necessarily found that the prisoner
was seen on that Sunday by one or both of said witnesses.
But the jury have passed on this question, and according to
the rules we have laid down, we can not say that the jury
were not justified in so finding, for they necessarily passed
upon the credibility of these witnesses, which we are unable
to do, without invading the province of the jury. The con-
versation of the prisoner with Emanuel White, as well as
that with A. L. Rogers, were introduced by the prosecution
for the purpose of furnishing some probable ground of attribut-
ing to the prisoner some motive, which might have moved
the prisoner to destroy the deceased. The motive sug-
gested in the argument of the Attorney General, is that
" he was induced to commit this crime by a jealous woman,
who felt outraged by the conduct of her husband." This
suggestion assumes that the husband and wife are guilty
of gross crimes, of which they were never accused, and of
which this record fails to furnish a single scintilla of proof.
It discloses no such misconduct or even a suspicion of
such conduct against Job W. Parsons, and no such jeal-
ousy, or cause of jealousy on the part of the wife; no fact
tending to show such misconduct of the husband or jeal-
ousy of the wife, is disclosed by this record, and the as-
sumption that such cause existed is wholly unsupported
by the testimony. Neither is there any evidence to show
that Mrs. Parsons ever mentioned the name of Frances Sum-
merfield to the prisoner, or that the prisoner ever had any
unkind feeling towards her. On the contrary according to

the testimony, the prisoner was the one of all others least likely to seek her destruction. The conversation had with White was the repetition of a course rumor, of which the best and purest of women may be the subject in the mouths of the low and vulgar; and this particular rumor, that she had told somebody she would give $50.00 to see her husband and Frances Summerfield together was not sufficient to cast the slightest suspicion upon the fair fame of any respectable woman, much less, to brand her as a murderess. No such shadow of sin falls upon her pathway; and such an idle rumor can not connect the prisoner with such a crime. Neither does the conversation with Rogers in any manner tend to implicate the prisoner in the alleged murder. The fact of having such a conversation with a man whom he had never seen but once before, would rather tend to show, that such a criminal purpose had never entered his mind. If his allusions to the impropriety of Parsons keeping Fanny Summerfield on his farm, were considered by the witness as impugning the purity of P.'s character, it is nevertheless susceptible of a construction entirely consistent with the proprieties of life, for he may have only intended to say that as it was known that Fanny Summerfield was a loose woman, he ought not to permit her to reside on his farm, as it was calculated to annoy his wife. The prisoner did not tell this witness what he meant by another "Red Creek affair," and the "understanding" of the witness can not in any manner tend to convict the prisoner with this alleged crime. Neither of these conversations can have any conclusiveness in their character, as both may be true, and the prisoner free from the slightest suspicion of guilt. The blood on the coat has been accounted for. Who wore the gum coat or how it was used from December 17, 1883, until May 6, 1884, when it was taken to Beverley at Mrs. Collets, or where or how it was kept while at her house from May 6 to September 15, 1884, does not appear, and the circumstance of a hair hanging to a button, can have no significance, as no one has pretended to say, when it was first found there, or whose it was—as a circumstance it has no conclusiveness; there is nothing to connect it with deceased, and its presence is entirely consistent with the hypothesis of the

prisoner's innocence. The same remarks apply with equal force to the statements alleged to have been made by the prisoner, that if he had to suffer, or to suffer innocently, others would suffer, &c. All these statements were made after the prisoner knew he was suspected, and all but one of them after he was in custody. There was nothing said to cause any other person to be suspected, or implicated, no effort to deny that he had been with the deceased, all Saturday night, or when he left, or the route by which he returned home, such statements had no significance when made nor did they acquire any by anything which afterwards occurred. They are perfectly consistent with the hypothesis of his innocence. The only circumstance that could have any criminal significance against the prisoner was in trying to have his brother Eben to tell that he had stayed at his house on Sunday night, December 16, 1883, and to induce his father and son to tell the same, to any person who might enquire where the prisoner had stayed that night, when in fact he had not stayed there. The prisoner at this time was already summoned as a witness to attend the coroner's jury, and the constable at that time had in his pocket a warrant for his arrest; and although the officer did not then inform him of that fact, it is altogether probable he had heard from others, that he was suspected, and would probably be arrested, and he doubtless thought he would escape trouble and expense if he could successfully create the impression that he was at his brother's house that night, and thereby avoid the necessity of telling where he did spend Sunday and Sunday night. No reason is offered by the prisoner for this attempted falsification of fact, except that he said "they would be scouring the country to find every man's whereabouts." He evidently did not want any one to know where he stayed that night. He could have made this plain, but until the State had proved the *corpus delicti*, and other evidence to connect him with the alleged homicide, he was under no greater obligation to show where he was on that Sunday and Sunday night, than was the witness Ray, or Lambert, or any other man in that neighborhood. Wherever he may have been, it is clear from the evidence that he returned to his own house, on Monday morning about "the

first chicken crow." It is equally certain that the house was in flames between four and five o'clock, and that the shortest distance between the burt house and the prisoner's home was eleven miles, and by the path he said he traveled it was seventeen or eighteen miles, by a mountain path with new fallen snow nearly knee deep. The prisoner was on foot, and it would seem under all the circumstances, it would have been impossible to have traveled from the burnt house to his home by the shortest route between the time the house first took fire, and first chicken crow. In the absence of all evidence connecting the prisoner with the alleged homicide, or the burning of the house, and the absence of all motive on the part of the prisoner to do so, and in view of the friendly relations existing between him and Frances Summerfield, we cannot regard the fact, that he endeavored to create the false impression that he stayed with his brother that night, as a circumstance connecting him with the alleged homicide, when it is possible he may merely have desired to conceal from his wife and children, that he had spent that Sunday with some other loose woman on Dry Fork, as he had the Saturday night before with Frances Summerfield. The prisoner's conduct may be entirely consistent with his innocence of the crime alleged against him, and his conduct is not inconsistent with the hypothesis of his innocence.

We are, therefore of opinion, that the evidence in the case under consideration is insufficient to warrant the verdict of the jury, and that the circuit court of Randolph county erred in overruling the prisoner's motion to set aside the verdict and award him a new trial. The judgment of the circuit court is reversed ; and the verdict of the jury set aside; and this cause is remanded to the said circuit court for a new trial to be had therein ; and to be further proceeded in according to law.

REVERSED. REMANDED.