## WARREN *v.* THE STATE.

1. The case being one of circumstantial evidence alone, the court properly instructed the jury as to the definition, and the degree of proof required for conviction by that character of evidence.
2. To sustain a conviction in a case of homicide, it is essential to prove the corpus delicti; that is, first, that the person alleged in the indictment to have been killed is actually dead, and second, that the death was caused or accomplished by violence, or other direct criminal agency of some other human being, that is, it was not accidental, nor due to natural causes, nor to the act of the deceased; and that the accused caused the death by one or more of the means charged.
(*a*) The evidence was insufficient to establish the second element of the corpus delicti, and that the accused was guilty as charged.
3. It was error to refuse a new trial. BECK, P. J., dissents.

No. 2728. MAY 12, 1922.

Indictment for murder. Before Judge Littlejohn. Macon superior court. June 11, 1921.

John Warren was found guilty of murder, with a recommendation of life imprisonment, under an indictment charging him with unlawfully and maliciously killing Lucinda Underwood, on April 21, 1921, "by choking and strangling her with his hands, and by smothering and by suffocation caused by wrapping her head with a quilt, and by igniting and burning her body with fire." The

evidence submitted on the trial in behalf of the State was to the
following effect: M. C. Mitchell testified that as a practicing
physican he attended the inquest held over the dead body of
Lucinda Underwood, about April 21, 1921. He saw the body in
the fireplace of a tenant-house, some 300 or 500 yards from the
dwelling of the defendant, John Warren. The body was lying
on its back wrapped in a quilt, the head in the corner of the fire-
place, and a part of the body extending over the hearth. One
leg was drawn up, the left hand was over the chest, and the fingers
on that hand were burned down practically " to the hand proper."
The front of the body from the " head down was charred, and the
skin even broken; some few blisters on her back. . . From
the chars or burns on the forehead was one or more cracks in the
scalp down to the bone, produced, I think, by the drying of the
tissues, burning. There were no marks of any violence, as I could
find. This charred quilt was all over the body, even to her head;
probably the quilt had been spread over her, or she had rolled up
into it or been rolled up into it; her head was completely covered
with it. I couldn't swear whether it was wrapped around her head
or not. There were some parts of her body that the quilt looked
to be probably two-plys. I have not made up a definite opinion as
to how her death was produced; there are two or three different
ways it could have been produced; she could have been strangled,
suffocated and burned, overcome with flames. . . There was
an odor of oil and smoke on the floor. I never examined the quilts
for oil at that time. I examined it at the committal trial, and
it had the odor of oil. I examine the particles handed me by the
solicitor, and state that it's got an odor of kerosene oil. . .
I discovered a burned place on her back. . . There was an
old sore on her back that looked like it must have been treated.
. . I could not detect any difference between the manner in
which her head was wrapped up, and any other part of her body,
so far as that quilt was concerned. . . If a person has an
epileptic fit, fall or lay down, and a spasm comes on, just as long
as it lasts they won't move, they stay in the same position, couldn't
move them with fire; a person in that condition might burn to
death without moving. . . In that house there were some
remains of household goods, probably a mattress, some old cover-
ings of some kind, a trunk, an old bedstead, and plows, a cotton-

planter or two, some guano and cottonseed. It looked to be just a general plunder house. That oil, in reference to where the body lay, must have been some two feet from the hearth and about the same distance from the closest portion of her body, from the fact that her body was not lying square with the hearth. . . . . It must have been kerosene oil from the odor on the floor, and I got the odor from the floor at that time, and it was kerosene. . . I did not see any evidence or signs of her hands on the sides of that chimney. There was sand in the bottom of it. There was no evidences of any struggle whatever. If a live body, in the convulsions of epilepsy, were lifted in that place and set on fire, there would be no rousing of the person from the effect of that fire,; you can't move a person in an epileptic fit. She could have been overcome in half a second with flames, and then she would have been dead so far as living movement was concerned. . . There had been fire in the fireplace; there were some chunks there of wood, some remains of charred wood; there had been fire in it at different times. I could not swear there was any fire there twelve to fourteen hours before this. It was an unused and unoccupied house; and if there had been any fire there, it was but very little, for there was barely any ashes there."

A. C. Heath, a witness for the State, testified to the effect that he saw the dead body of Lucinda Underwood on the occasion of the inquest, and it was lying in the fireplace, as testified to by Dr. Mitchell; and that when the witness entered the house where the body lay, he distinctly smelled the odor of kerosene. The witness exhibited certain quilts which he testified were " gotten up Sunday evening after we went out there on Friday morning, . . and there was kerosene odor on that quilt." He smelled it at the committal trial, and when he saw it on the dead body. There was no evidence of a struggle about the fireplace. " There were three plys of that quilt ashes, the quilt burned off plum around the head. I taken my pencil and unwound it. From seeing these burned ashes of this quilt and plys around her head, I would say that the quilt was wrapped entirely around her body. In front of the unoccupied house in which her body was found, there was a fresh harrow track that went up and turned; it come from John Warren's house and turned in front of the house in which this girl was found. The harrow started between his garden and wagon-shelter,

which was in a direct direction towards this little house. It come back and stopped practically in the same place it started from; may have been a few feet or inches different. I could tell that it was operated both ways, going and coming; and it turned around right in front of the house in which this girl was found. I only know who made that harrow-track there from what John told me. I asked him about it; and he says, ' I drove the harrow up there that morning.' If any tracks had been made between John Warren's house in that road to that outhouse, that harrowing going and coming effaced those tracks so they could not be seen. This was in Macon county. . . Possibly John might have told me that he went there to help a boy load some guano out of that house, but I don't remember what he said he was there with the wagon for. He told me that when he opened the door to get the guano out, he found that girl there, and told me that he holloed and told them to ring the bell, and that he sent for Mr. Thomas to come out there at once. He told me they did not go to the field, they all went to the house, turned the harrow back and drove it back to the house."

Ida Cunningham testified in behalf of the State, that she was a sister of Lucinda Underwood; who was about 18 years old, and was an epileptic; that Lucinda formerly lived with the witness and her husband, Levy Cunningham, on the Hatcher place; that in April, 1921, witness separated from her husband, and she and Lucinda went to John Warren's place, occupied together a separate room in his house, and worked on his farm; and that Lucinda had nothing to do with the separation of the witness and her husband. (Quoting the witness) " I seed my sister the morning that the coroner held his inquest out there. The night before that, me and my sister slept in a room we had at John Warren's house, and John and his family had a room. I went to bed early that night. I never paid no attention to the clock. When I went to bed, with the exception of my skirt, I slept in my work clothes. John Warren called me during the night and told me to get up and help carry off my dead sister, and I went with him. He made me help carry her to that little house. He told me I had better follow him out there, and she was lying there between the lot and the wash place, and she was dead. I did not take hold of her body. I took hold of the rope and it was doubled under her body, right

across here and here [indicating]. It was across her back and under her back here [indicating] and about her knees here [indicating]. I took hold of one side of it, and Mr. John Warren took hold of the ·other side, and we carried her to that little house that she was afterwards found in, and we put her in the fireplace. John then struck a match and started a fire; then I come on out and come on back to the house. John told me if I told he would blow my g — damned brains out. I was afraid of him. When I got back to the house I did not go to sleep. I stayed awake all night. When Mr. Moore [defendant's counsel] went out to see me next day at John's house, and Mr. Cannon, I did not tell them that I helped John to move the body. I don't know what I told them. I done forgot what I told them. I am telling the truth about it now. Mr. John Warren drove that harrow in front of that house that morning. The next morning he told me if I told it he would blow my damn brains out.· . . I told the coroner's jury I didn't know nothing about it; but I was scared then. I told them that me and my sister went to bed that night; but I was scared. I am scared now. I told them that during the night my sister waked up and told me she was going down to that little house to sleep. I swore that before the coroner's jury; but I was scared then. And I told them that I didn't know anything more about it, that I had been plowing all day and went right back to sleep; but I was scared then. I said that the next morning they called me to go to work. I swore that before the coroner's jury; but I was scared then; and when I come out I said that John Warren asked me where was my sister, and I told you [defendant's counsel] and Mr. Cannon that, and swore it before the coroner's jury; but I was scared. I said I didn't know where she was. The morning we found my sister down there in the house, John called me out and asked me where my sister was, when she didn't come out with me; and I told him I didn't know where she was. We went out to the lot, and John's boy hitched up the wagon to get some guano, and John hitched up the harrow, two mules to the harrow, and two mules to the wagon, and John drove the harrow ahead of the wagon down to that house, and told us to stop there and get some guano; and he drove a little beyond the house with the harrow, and me and his boy drove the wagon up to the porch of the house to get the guano, . . and John got off the harrow and come back to

where we were.  John's boy couldn't load the guano by himself, and John come back there to that house to help load the guano. When he pushed the door open he said that old girl had done burned up herself; and he told me if I told, he would blow my damn brains out.  He holloed to his wife to ring the bell, and she did it, but the clapper fell out.  John sent his boy to tell Mr. Thomas about finding my sister burned up.  I guess he told him to tell Mr. Thomas to come there.  I went back to the house. I looked at my sister.  I did not go in the house.  I seed her up there at the house; she was at the fireplace.  I don't know how many wraps of quilts she had around her.  I didn't take them off of her so I could see her.  I knowed my sister was dead, 'cause he made me help carry her up there that night; that's the reason I know she was dead.  John wouldn't let me go to the funeral. . . I told them that I didn't want to ride to the cemetery in a wagon, that's the excuse I made, but I was scared then; they wouldn't let me, and I was afraid of Mr. John Warren. . .  John treated me mean and cussed at me.  I told the coroner's jury that me and my sister ate at his table with him and his family, and that he treated us like his own children; but he didn't. I swore that, but I was scared of Mr. John Warren. . .  He has put his hands on me, and has hit me when we were working in the field.  I swore before the coroner's jury and in the committal trial that John never put his hand on me or my sister in our lives; but I was scared. . .  My sister did not kindle a fire every time she stopped anywhere, and she set fire to herself no times as I know of. She did not get on fire out there to the washpot one morning and John Warren put her out.  He did not jump out of his automobile and go and put her out.  I swore that in the committal trial, but I was scared.  She fell in the fire in the room and burned her back here about five or ten days before we found her down there in that house.  I pulled her out of the fire.  She was bathing when she fell in the fire.  I don't know whether she had a fit or not.  She didn't try to get out until I pulled her out.  She lay there until I pulled her out, and she had a big burned place on her back.  She made up some grease and put on there.  I don't know whether there was any kerosene in there or not.  I didn't fix it.  His [defendant's] wife did.  I don't know whether there was any kerosene in it or not.  I had a bad cold right then, and couldn't smell.  I

don't know how long it was I had been rubbing her with that. . . Sometimes she had to take her clothes off for me to rub her. We all slept in the same room. She did not sleep on a pallet on the floor; she slept in bed, and when I rubbed her back she put her clothes back on. . . She would not frequently get up at night, go out and go down to that house. I never knew of her getting up and going down to that house. . . My sister was not kinder half-witted; she had good sense, near as I knows about it. . . ·I say John Warren made me get up at night to help him tote my dead sister off. I don't know what time of night it was. He told me I had better get up and help carry off my dead sister. He hollered it out loud. I don't know whether he knocked at my door or not. He waked me up by calling me; said I had better get up and help carry off my dead sister. He waked up his wife. I don't reckon she come out of her room. I was scared. The body was laying between the lot and wash-house. I don't know exactly how far it is from the house. It was wrapped up. When he set her afire up at the house it blazed up like kerosene was on it. I don't know whether she ever went to bed or not. I was tired and sleepy. . . I never knew anything about how many times she was wrapped up in that quilt. I seed she was wrapped up in a quilt. · When he made me get up and go out there and help carry her off, he had fixed her up." Q. " He carried her out of the house and had her half way between the house and the lot, lying on the ground ? " A. " Yes sir." Q. " Was she stretched out or in a wad ? " A. " She was stretched out." The witness testified that the dead body of her sister was found on Friday, and she went back to live with her husband on the following Sunday, and was living with him at the time of the trial.

Levy Cunningham testified for the State that he and his wife never had any trouble on account of her invalid sister, Lucinda Underwood; that he saw his wife on Sunday, and she said she wanted to come back home, and he told her to come.

The defendant submitted no evidence, but made a statement to the jury in which he said that he had nothing to do with Lucinda and her sister coming to his place; that on his return home from Macon he found them there, and decided to have them leave, as he did not care to have women on the place with his boys, but that his wife said they had no home, no place to go, and that they could

help her, and therefore he consented for them to remain. He said he treated them kindly and did what he could for them; that he knew nothing about the death of Lucinda until he found her dead body in the little tenant-house; that he immediately sent his son to his wife to ring the bell, but the bell-rope broke, and he had to send his son to the white neighbors for them to come and have the death of the girl investigated. He denied everything to which Ida Cunningham had testified, tending to connect him with Lucinda's death.

The defendant moved for a new trial, on the general grounds that the verdict was contrary to the evidence, and without evidence to support it; and because the judge erred in his charge on circumstantial evidence. A new trial was refused, and the defendant excepted.

*Jere M. Moore,* for plaintiff in error.

*George M. Napier,* attorney-general, *Jule Felton,* solicitor-general, and *Seward M. Smith,* asst. atty.-gen., contra.

FISH, C. J. (After stating the foregoing facts.) There is no merit in the amendment to the motion for new trial. The case is one of circumstantial evidence, and of course it was not error to give the jury the definition of that character of evidence and when it is sufficient to authorize a conviction, as stated in the Penal Code (1910), §§ 1009, 1010.

The case turns upon the question whether the corpus delicti was sufficiently proved. Before a conviction can be legally had on the charge of murder, it is essential, in proving the corpus delicti, to show that the person alleged in the indictment to have been killed is actually dead, and that the death was caused or accomplished by violence, or other direct criminal agency of some other human being. 1 Whart. Cr. L. (11th ed.), § 347. In 1 Whart. Cr. Ev. (10th ed.), § 325d, it is said: "The general rule in homicide is that the criminal agency — the cause of the death, the second element of the corpus delicti — may always be shown by circumstantial evidence. To sustain a conviction, proof of the criminal agency is as indispensable as the proof of death. The fact of death is not sufficient; it must affirmatively appear that the death was not accidental, that it was not due to natural causes, and that it was not due to the act of the deceased. . . It must affirmatively appear that death resulted from criminal agency. But

the criminal agency is sufficiently shown where a dead body is found with injuries apparently sufficient to cause death, under circumstances which exclude inference of accident or suicide;" etc. This principle was applied in *Langston* v. *State,* 151 *Ga.* 388 (106 S. E. 903), where many decisions of this court on the same line are cited and discussed.

To authorize a conviction in this case, it was necessary for the State to prove beyond a reasonable doubt that Lucinda Underwood was dead, and that she was killed by being choked or strangled with the hands of the defendant, or by being smothered or suffocated by having her head wrapped up with a quilt by him, or by his burning her with fire. And the evidence being wholly circumstantial, the proved facts had not only to be consistent with the hypothesis that the defendant caused her death by one or more of such methods, but had to exclude every other reasonable hypothesis save that of her guilt as charged. The State failed to prove that she was burned to death, as the State's witness, Ida Cunningham, testified positively that her sister, Lucinda, was dead when she saw her body lying in the defendant's yard wrapped in a quilt, and before it was carried to the house where it was found in the fireplace. And she also testified that she saw the defendant set fire to the quilt after the dead body had been placed by herself and the defendant in the fireplace. There were no marks of violence found upon the body of Lucinda, except those caused by the burning of the quilt, and a burn on her back which she had suffered some time before the homicide. Dr. Mitchell testified that he discovered no marks of violence upon the dead body, except the burns, and that (to quote him) " I have not made up a definite opinion as to how her death was produced; there are two or three different ways it could have been produced; she could have been strangled, suffocated and burned, overcome with flames." We have already stated that it appeared that her death was not caused by burns, and the doctor, as we have seen, found no evidence to indicate that she was strangled or suffocated. He merely thought that her death could have been caused by such means. This may be true, but why could it not have been caused by other means than by strangulation or suffocation ? Of course, the jury had the right to believe the testimony of Ida Cunningham to the effect that the defendant some time during the night awakened her by calling her in a tone sufficiently loud to

awaken his wife, and demanded that she (Ida) come out into the yard and help to remove the dead body of her sister. If the defendant had killed Lucinda by strangling or choking her, or by suffocation by wrapping a quilt around her head, and her body was lying in his yard, why did he wish to remove it several hundred yards away to the tenant-house, and to awaken the sister of the dead girl, thus making a witness against him, and requiring her to aid him in carrying the body to the house? Why did not he leave it in the yard, or, if he desired to move it to the house, why didn't he carry it himself? Lucinda was an 18-year old girl, and it did not appear that she was of unusual weight, nor did it appear that the defendant was not an able-bodied man. Besides, no motive whatever appears why the defendant should take the life of the deceased. She was a laborer on his farm, and, so far as the record shows, without pay, except as to what she ate. On the inquest and the committal trial Ida Cunningham's testimony was directly to the contrary of what she testified on the trial in which the defendant was convicted. It is true that she testified that on the former trials she was scared; that she was afraid of the defendant; that he had threatened to kill her if she told. Told what? Told that he had waked her up at night and told her to come out and help to carry away the dead body of her sister; that he had made her do this, and that they had placed the dead body in the fireplace of the tenant-house, and that defendant had set fire to the quilt wrapped around the dead body. But, as we have said, the credibility of the witness was for the jury alone to determine. Evidently they believed her worthy of credit; and this court can not say that the jury erred in respect of this matter. We cannot grant a new trial for the reason that we might not have believed the witness if we had been on the jury. However, a reversal of the overruling of the motion for a new trial must be had, for the reasons that the evidence was not sufficient to show, beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis, that the death of Lucinda Underwood was caused by a criminal agency, and was not the result of accident, or disease, or of her own act; and that, considering the testimony of Ida Cunningham as true, it wholly fails to prove the necessary elements of criminal agency of the corpus delicti, and fails to prove that the defendant caused the death of Lucinda by one or more of the means

charged in the indictment. In support of our conclusion see *Murray* v. *State*, 43 *Ga.* 256; *Lee* v. *State*, 76 *Ga.* 498; *Bines* v. *State*, 118 *Ga.* 320 (45 S. E. 376, 68 L. R. A. 33); *Epps* v. *State*, 149 *Ga.* 484 (100 S. E. 568); *Langston* v. *State*, 151 *Ga.* 388 (106 S. E. 903); State *v.* Flanagan, 26 W. Va. 116; Sheppard *v.* State, 17 Tex. App. 74.

If Ida Cunningham's testimony be true, it casts a grave suspicion upon the defendant as to the cause of Lucinda's death; yet a conviction can not, of course, stand based upon a serious suspicion alone. For the reasons stated the judge erred in not granting a new trial.

*Judgment reversed. All the Justices concur, except Beck, P. J., dissenting. Hill, J., concurs specially.*

BECK, P. J. Being of the opinion that there was some evidence to authorize the jury to find that the defendant committed the murder as charged in the indictment, I dissent from the ruling of the majority.