WESTBROOK *v* THE STATE.

1. The accused, in his statement to the court and jury on his trial for arson, having said that at the time of the burning he was in his house asleep, and the evidence showing that his house was a quarter of a mile or more distant from the scene of the offence, it was not error to instruct the jury on *alibi* as a defence set up in the case, and that the burden of proving it was upon the accused. As matter of pleading, the defence of *alibi* is covered by the general issue of not guilty.

2. There was direct evidence of the burning and circumstantial evidence from which the jury could rightly infer that the fire was not accidental but felonious. Thus the *corpus delicti* was established independently of the confession. The evidence was ample to warrant the verdict.                    *Judgment affirmed.*

October 8, 1892.

Before Judge FISH.   Sumter superior court.   May term, 1892.

Russell Westbrook was tried for the offence of arson of a barn and stables on the farm of Bass.   He was found guilty, and his motion for a new trial was overruled.   In addition to the grounds that the verdict is contrary to law, evidence, etc., it is alleged in the motion that the court erred in charging on the defence of *alibi*, because there was no such defence, and defendant did not plead *alibi*.   The judge certifies that the evidence for the State showed that defendant's home, house where he lived, was a quarter or half mile from the houses burned, and defendant said in his statement to the jury: "At the time of the burning I was in my house asleep; what time it was I could not tell.   I was frightened at the time that this gentleman came by and called me.   Mr. Tommie Griffin and Johnny Downs came there.   They called Russell, Russell, Russell.   I was asleep and never heard them; my wife was side of me; she touched me and woke me up.   Johnny Downs said, 'Call him again.'   Mr. Tommie Griffin said, 'Rus-

sell, Mack's house is on fire.' I said, 'No it ain't.' I jumped up."

The evidence for the State, briefly stated, was to this effect: The burning, by fair inference, was not accidental. The defendant had been employed by Bass, and was angry with him. The fire was discovered by Bass about half-past eight or nine o'clock at night. Defendant lingered about the premises after dark. When Bass, who was the first person who got to the burning buildings, reached them, he discovered that defendant's cow, which had been put in the stable, had been released, while Bass's cow, which had been left loose in the lot, had been put into one of the stalls, and with other stock of Bass was in the burning buildings and burned up. Tracks were found about the premises corresponding to tracks of defendant and leading towards defendant's house. Defendant was overheard by Bass and others in a conversation between defendant and one Wimbush, who seems to have been employed to obtain the confidence of defendant, Bass and the others mentioned being concealed, to state that he burned out Bass because Bass would not let him have his (Bass's) mule and buggy to take defendant's wife to preaching sometimes, nor let him have $2 for his wife to give to the preacher. Defendant lived within about a quarter of a mile of Bass's. A witness who lived about half a mile from Bass's had his attention attracted to the fire, and came by defendant's house on his way to the fire. He called defendant, and after calling him six or seven times loud enough to wake him up if he was asleep, getting no answer called him again, and defendant came to the door in his shirt sleeves with his pantaloons and shoes on. This witness asked defendant if he did not see that everything Bass had was burning up; defendant said, no, he reckoned not, and witness replied, "If you will look you can see

better than I can tell you." Defendant's wife opened the window back of the house, and the best that witness could see, looked like she was dressed. The fire was right opposite defendant's house, and when defendant opened the door in front of witness it was the door next to the fire, and defendant could have seen the fire as good as witness. Defendant did not go on with witness, but witness had been at the fire about half an hour before defendant came, and the first thing witness saw him do after he got there he (defendant) was going around to a little lane where his cow was. When defendant was arrested he asked what it was about, and was told it was for arson; and a few minutes afterwards defendant, while talking about Wimbush, said, "I know the damned nigger gave me away." A witness asked, "Gave you away how?" Defendant replied, "He has been to my house, and me and him have been talking, and I know the damned nigger gave me away."

The defendant introduced no evidence. He stated what has already been noted, and as to Wimbush he said that Wimbush came to his house and told him that he (Wimbush) and Mr. Parker were getting $75 to work up a case concerning Bass's barn, and that he (Wimbush) would give defendant $25 to confess that he (defendant) did it; said he said he was going to get a big pile of money, and wanted defendant to confess so that he could get his money, but defendant never gave Wimbush any satisfaction about the burning, etc.

Hinton & Cutts and L. J. Blalock, for plaintiff in error.

C. B. Hudson, solicitor-general, by Harrison & Peeples, contra.