REYNOLDS *v.* THE STATE.

No. 7688. JULY 18, 1930.

*D. A. Bragg,* for plaintiff in error.

*George M. Napier, attorney-general, W. G. Neville solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HILL, J. Walter Reynolds was indicted for the murder of John Mincie by shooting him with a gun. He was tried, convicted, and sentenced to be electrocuted. He made a motion for new trial on the usual general grounds. Subsequently he amended his motion by the addition of one ground.

The evidence relied on by the State for conviction is purely circumstantial. From the evidence it appears that on the night of the homicide the house of the deceased was burned a few minutes after eleven o'clock. A crowd soon gathered. The plaintiff in error in this statement emphatically denied the commission of the crime.

We think that the evidence raises only a mere suspicion of his guilt, and does not exclude every other reasonable hypothesis save that of the guilt of the accused. On the night of the death of the deceased, the defendant was seen at the sawmill near the house of the deceased which was burned, and asked the night watchman at the mill for a drink of water, after which defendant left, going in the direction of his home, which was a short distance from the house where the deceased, his wife, and two children lived, and where their partly charred bodies were found after the fire, which consumed their house. About thirty minutes after defendant left the night watchman, two shots were heard in the direction of deceased's house. Ricketson, one of the State's witnesses, testified that when he first reached the burning house where the bodies were, the defendant was standing there. "We were standing at the back corner of the house," and defendant asked if witness thought the bodies were in the house. "This defendant was standing right opposite me in front of the window from me, wringing his hands and looking at me and looking down, and I looked at where he was looking down and saw the stock of a gun sticking out from the edge of the house, and he was closer to the gun than I was, bent over. The defendant was standing wringing his hands and hollering and asking me, 'Mr. Ricketson, you reckon they are in there?' and he never put his hands on the piece, and kept screaming, 'Jesus have mercy, what will we do?' He never helped me do anything but get an ax. I finally told Walter [the defendant] to get an ax and tear down the fence, and he ran and got the ax and threw it down, and somebody grabbed the ax up. . . After this fellow got the ax and went to work with it, Walter got one of the little laths and tore out and went across the woods running with the lath in his hand, and I said, 'He ain't got no sense,' and I never saw him any more until the next morning. . . Mr. Turner and myself discovered that the bodies were in there, and we got some boards and got the bodies out; that is, we tried to. We did not spread any water except around the bodies. We removed the bodies from the ashes or embers before the rest of the house cooled down. We went in there and moved the bodies out on the boards; that is, the old people. We moved them out with forks. . . The condition Johnnie Mincie's body was in, before it was disturbed, was, he was lying flat on his back with his head towards the fireplace and

his feet towards the foot of the bed; his feet and his hands were burned off, but his stomach wasn't burned out, and on his left side over his heart there was a place like that [indicating], which was just tore, and part of his heart was sticking through, and his heart was all tore up. Of course the fire had crisped it and smoke had darkened up the rest of the body, but it was in good shape except that it was crisp from the fire. The place on the chest appeared to be a wound of some kind; to my judgment it was a wound from a shotgun, and his heart and side was literally torn up with shot. That would indicate that the shot had been fired at close range. I examined the body of John's wife. Her body was all right, but her face was literally crushed in and all crisp, but all this part of the face [indicating] was busted in. I went in and got her skull and placed it on the rest of the body. Her body did not have any wounds on it. . . We got them [the children] out. Mr. Turner was standing close by, and the boy was cut just below the short ribs, at just the edge of the ribs from the middle of the stomach to right along there [indicating], a straight gash across the stomach, and one piece of his liver was sticking out there [indicating], and it was crisp around the edge of it where it was sticking high out. . . I saw indications of a gun inside of the house after it had burned down, besides the one that I have been talking about a while ago. I saw one inside the room where Johnnie Mincie was sleeping at. The part of the house that it was in was in the same room where he was lying right over in the corner of the room lying in the ashes. It was all the way across the room from where Johnnie was lying, and I should think the room was ten feet wide. . . I only found the barrel, and it was the barrel of a single-barrel shotgun; all the rest of the gun had been burned up. Both guns were single-barrel guns. One of them had part of a shell in it, nothing but the metal part remaining."

Mr. Turner, on whose place the defendant lived, testified as follows: "At the time that this happened this defendant, Walter Reynolds, was working for Mr. Alwood. Mr. Alwood came to me some time prior to that, and said that he needed a head-block setter, and asked me if I had one that I could spare him; and I told him that I had, and sent Walter Reynolds to him. I think he carried Walter there; anyway I told Walter to go. He did not want to go to work for Mr. Alwood, when I called him to go to work for him. He

did not want to go, but he consented to go and did go. I saw Walter Reynolds the next day after this happened there. Where I saw him the next day was in my commissary. He had a conversation with me there; he came in and asked me if I would do him a favor, and I asked him what it was, and he said that he wanted a pair of shoes to wear to the funeral. I demurred. I told him that he was already indebted to me, and besides he was working for Mr. Alwood, and he said that he would pay me Saturday night for the shoes; and he then said that there was something else he wanted to talk to me about, and that was he certainly would like to get his job back with me. Johnnie Mincie was dead at that time, but they had not buried him. He told me what he wanted to do for me; he said that he wanted to get his job back with me. He did not say what job he wanted back, only Mincie had set blocks with me, and that was not his regular job. At that time they had Mincie's body in a little chapel on the hill before leaving for the funeral. I did not notice anything particularly abnormal about Walter Reynolds that day; he is a rather nervous type darky, he is always kind of nervous, and he might have been a little more so than usual. As to whether I advanced him any money that day, I let him have the shoes. I did not fire Walter. Mr. Alwood came to me and asked me if I could spare him a head-block setter and I let him have Walter, and I agreed for him to hire Walter. Walter Reynolds had been living on my mill quarter for a great number of years and had his family there." L. L. Toole, for the State testified: "I have examined this gun found at that house since that house was burned down [identifying the gun found under the edge of the house]. That is positively the same sight that I put on the gun for the defendant Walter Reynolds in 1927."

■ The evidence did not authorize the verdict.

■ The sole special ground of the motion for new trial complains that the court erred in not giving a more comprehensive charge on the law of circumstantial evidence. The court charged Penal Code (1910) § 1010, on the subject of "circumstantial evidence, when sufficient;" and the complaint is that this section, when read to the jury, does not fully instruct them on the rule of circumstantial evidence; that the average juror does not know the difference between a "hypothesis" and a "hypothenuse," and a charge in the language of the code, that, "To warrant a conviction on circumstantial evi-

dence, the proved facts must not only be consistent with guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused," without more, is unintelligible to the jury. The charge as given was the law on the subject as laid down in the Code, was applicable to the case, and was sufficient, in the absence of a timely written request, for a more elaborate charge on the subject. It can not be assumed that the jury did not understand the language of the charge. This ground is without merit.

It was error to refuse a new trial.

*Judgment reversed. All the Justices concur.*