## GRAHAM *v.* THE STATE.

No. 11634.   FEBRUARY 16, 1937.

*Chester A. Byars, T. P. Stephens, J. E. Baird, E. L. Stephens,* and *R. I. Stephens,* for plaintiff in error.

*M. J. Yeomans, attorney-general, W. H. Connor, solicitor-general, B. D. Murphy, E. J. Clower,* and *John McGehee,* contra.

RUSSELL, Chief Justice.   B. A. Graham was charged with murdering his wife by shooting her with a gun.   From the evidence adduced on the trial substantially these facts appeared:   On the morning of June 18, 1936, around half past seven o'clock, the wife was found dead in the bed at her home in Silvertown, Upson County.   She was lying lengthwise on her back, and turned slightly to the left, with her feet drawn up and one knee crossed over the other, not exactly in the middle of the bed, but with her head somewhat closer to the edge than the rest of her body.   Just below the right collar-bone was a gunshot wound that apparently went straight in, and was about the size of an orange.   There were some slight powder burns on her neck and shoulder.   Her death was instantaneous.   Her gown was pulled up above her waist and under her breasts, and the sheet was pulled up over her naked body.   There was no blood on either side of the bed, but where her body lay and from her hips to her head blood had soaked through the mattress and to the floor underneath.   Among a number of witnesses, including the members of the coroner's jury, a policeman testified as to finding some small spots of blood on the hearth about twelve feet from the foot of the bed, and on the wall near the fireplace.   A single-barrel 12-gauge shotgun was found resting against the bed on the left side, two or three feet from the head, with the barrel against the bed and the stock on the floor, which was covered with a new linoleum rug.   A fire poker was hanging in the trigger-guard, but whether it was behind or in front of the trigger the evidence was in conflict.   An empty shell was in the gun.   No one was in the house except the deceased and the defendant.   The deceased woman was 23 years old, and was the mother of a boy

of five years. He lived with her mother. Both the deceased and her husband worked at the Martha Mills, and on the shift that came off duty in the nighttime. The mother of the deceased testified that the deceased and her husband never had any trouble, any real quarrels; that witness made the cash payment on an automobile, and gave it to her daughter, who was to pay the balance; and that the contract therefor was in the name of the deceased, the witness wanting it that way; that defendant and deceased had some "little disturbance" about the automobile being in the name of the deceased, he wanting it in his name, and having made an effort to have it changed from her name to his. The automobile salesman testified that the defendant did not come to see him about the matter, but, there having been some mistake in the original contract, and it being necessary to draw new papers and have them signed, he went to the defendant's home to have the correct contract signed by the wife, and she was not at home, and defendant asked witness to let him sign them, and witness replied, no, the contract would have to be signed the same as the original one had been; and that defendant did not ask witness to let him sign the contract any more than to let him sign the correct one. Another witness testified that he was sitting with the defendant in a swing on the porch of the home of the mother of defendant's wife, and the deceased walked across the yard with the little boy; whereupon defendant remarked, "There she goes, she is as mad as the devil, and some time I am going to get so far away it will take thirty-five cents to send me a postal card." Another witness testified that on Wednesday night, June 17, he was drinking beer in a café, and the deceased and the defendant were also in the café; that he did not know "for certain just what she said, but she either said 'I am going if it kills me,' or 'I am going if you kill me,'" and that he would not be positive which remark the deceased made, but "there was a 'killing' in it." The mother testified further that her daughter would come and visit her every Wednesday, spending the night with her; that she was expecting her that Wednesday night just before she was found dead the next morning; that she and a younger sister had planned a picnic together on the following Friday at Indian Springs; that when witness heard of the death of her daughter early Thursday morning she immediately went to the home, and that the defendant did not meet her.

Dr. Taylor, of Thomaston, testified that he received a call to go to the home of defendant, about seven-thirty on the morning of June 18, from Mrs. Parish of the Silvertown café, and he went immediately; that the defendant was the only one at the house when he got there; that defendant was in the living-room, and he pointed to the bedroom and said, "Into the next room;" that witness did not probe the wound much; that it went in almost straight but slightly tilted; that relatively to the deceased the gun was on the left side of the bed; that he had had some experience with shotguns, and if one was placed against the body and fired, you would expect some powder mixed with the blood, and it would have a slight smutty tinge; but that he did not find any of that to amount to anything, any discoloration which he could attribute to that situation. E. M. Goodroe, the police officer of Silvertown, testified that he had a call to go to the home of the defendant; that he was told to go by Mrs. Parish at the café, who said that they wanted him to go to defendant's home, as he was needed there; that this was about seven-thirty or a quarter to eight in the morning; and that it is very thickly populated around where defendant resided. Another witness testified that he received a message relative to the deceased, went to her house, and there found Dr. Taylor, the police officer, and two others. This witness also, as did others, testified that if the stock of the shotgun was placed on the linoleum floor and the trigger fired, the gun would rebound unless there was a tight grip on it; that it would not sit still, but would kick out. The undertaker testified that from the nature of the wound on the body of the deceased the gun would have had to be in a position straight from the body to make it. Mrs. Joe Sims testified that she lived next door to defendant and had a telephone in her house, that she was at home the morning the deceased was found dead, that she heard what she thought was the report of a gun at defendant's house, but did not hear any commotion or crying of any kind over there after the report of the gun, that it was early in the morning, but that she didn't know how long after she heard what she thought was a gun shot before she knew anything had happened, that she didn't know whether it was thirty minutes or an hour, that it was about six-thirty that she heard what she thought was the report of a gun and that was before she found out what had happened, that

she don't know just how much time elapsed, that she did not go over there, that she did not know defendant and his wife and they didn't know her, and that neither had been in the house of the other.

Several members of the coroner's jury, one of whom was a physician, testified for the defendant, to the effect that the deceased was lying on her back in the bed when they found her about eight o'clock in the morning; that they made a demonstration with the gun and poker; that her body was raised to a sitting position in the bed, and the gun was placed on the floor and against the body and the gun, "and the wound just fitted;" that they looked around the room and made a search of the premises, and found blood only on the bed and on the floor under it; that ".in order for that wound to have been made with this gun she would have had to be leaning forward from a sitting position—it would have to be right straight in front of her, at right angles. The stock of the gun would have had to be resting on the floor with the end of the barrel against her. We placed the stock on the floor and placed the gun in about this position" (demonstrating). "Using this chair as the bed, the gun was placed like this on the floor," the "body brought over like this, on the bed, and leaned her forward from a sitting position, . . and the shot would have gone straight in. The load came out here. If she had been in this position" (demonstrating with chair), "the load would have gone in this way, but the load did not go through this way. The load would have gone practically straight in, with her in a leaning position like this;" that "if she had been leaning forward from a sitting position she would have slumped forward like this;" and that if "that gun had been placed with the stock on that linoleum floor, and fired, . . it would have gone one way or the other, it would have kicked off the bed." One witness stated that it was possible that it would have kicked off, and it was possible that it would not have. Another said, "If that gun had been resting against the bed, and this poker had been placed there, and the gun fired and death was instantaneous with the report of the gun, I think it would have knocked her back. I don't know whether the gun would have kicked out on the floor or not, but it would have knocked her back; but really I don't know just what would have happened to the gun. The gun would have had to be at right

angles for the load to have gone in straight this way. We pulled her up in a sitting position on the left side, like this; and if the gun was fired in this position, it would be straight in like this. I believe the load would have gone straight in if she had been in this position. It will go straight in, if it is placed in this position" (demonstrating). "She would not have fallen out on the floor if she had been in this position; she would have gone back this way, kind of to her right side like." A witness stated that "in order to reach the trigger of the gun with this poker, she would have had to have been in a sitting position, leaning forward, like this." Witnesses made the demonstration with the body in a sitting position, leaning forward, and the gun-barrel fitted into the wound.

The defendant made a statement to the effect that he and his wife got along well together; that she worried about the death of her baby, which happened sometime before; that she had "threatened" that she was "fed up on this old world;" and that he was shaving in the bathroom when he heard a "racket" in the bedroom, and he rushed in there and found his wife dead. There was no evidence to show that he gave an alarm, or why Mrs. Parish, the Silvertown café proprietress, was not placed on the stand as a witness. It does not appear how she found out that defendant's wife was dead, or whether he told her to notify the doctor, the police, etc. The jury returned a verdict of guilty. The defendant moved for a new trial on the general grounds alone. The court overruled the motion, and the defendant excepted.

This case presents to this court the one question whether the evidence adduced to establish the guilt of the accused was sufficient to authorize his conviction. We have made a very painstaking review of the evidence. It must be conceded that the evidence consists entirely of circumstances from which the guilt of the accused must be inferred. "Circumstantial evidence is that which only tends to establish the issue by proof of various facts, sustaining by their consistency the hypothesis claimed." Code, § 38-102. "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." § 38-109. "Whether dependent upon positive or circumstantial evidence, the true question in criminal cases is, not whether it be possible that the conclusion at which

the evidence points may be false, but whether there is sufficient evidence to satisfy the mind and conscience beyond a reasonable doubt." § 38-110. In criminal cases dependent on circumstantial evidence, as said by Warner, C. J., in *Earp* v. *State,* 50 *Ga.* 513, where two men were charged with a felony, "In looking through the record in each case, we are clearly of the opinion that there is no evidence which would have authorized the jury, under the law, to find the defendants guilty of the offenses with which they are charged. They may have been guilty, but they were not *proved* to have been so; and therefore the verdict in both cases was contrary to°law. The law does not allow any one to be convicted of any offense merely on a *suspicion* of their guilt. It would be a just reproach to the judicial tribunals of the State, and to the administration of the laws thereof, to allow a conviction to stand on the evidence contained in the record before us." It is well settled, of course, that this court does not decide issues of fact, but this court has never hesitated to correct injustices where juries have convicted upon evidence which did not measure up to the legal requirements. *Reynolds* v. *State,* 170 *Ga.* 810 (154 S. E. 229) ; *Cornwell* v. *State,* 179 *Ga.* 668 (177 S. E. 235). In delivering the opinion in *Warren* v. *State,* 153 *Ga.* 354 (112 S. E. 283), Mr. Chief Justice Fish said: "Before a conviction can be legally had on the charge of murder, it is essential, in proving the corpus delicti, to show that the person alleged in the indictment to have been killed is actually dead, and that the death was caused or accomplished by violence, or other direct criminal agency of some other human being." It.was ruled that it is essential to prove that the death "'was not accidental, nor due to natural causes, nor to the act of the deceased; and that the accused caused the death by one or more of the means charged." Also: "In 1 Whart. Cr. L. (10th ed.), § 325d, it is said: 'The general rule in homicide is that the criminal agency—the cause of the death, the second element of the corpus delicti—may always be shown by circumstantial evidence. To sustain a conviction, proof of the criminal agency is as indispensable as the proof of death. The fact of death is not sufficient; it must affirmatively appear that the death was not accidental, that it was not due to natural causes, and that it was not due to the act of the deceased. . . It must affirmatively appear that death resulted from criminal agency. But the

criminal agency is sufficiently shown where a dead body is found with injuries apparently sufficient to cause death, under circumstances which exclude inference of accident or suicide.' This principle was applied in *Langston* v. *State*, 151 *Ga.* 388 (106 S. E. 903) where many decisions of this court on the same line are cited and discussed." In the *Langston* case, just referred to, the unanimous opinion of the court was delivered by Mr. Justice Atkinson, who said: "In harmony with and in recognition of the principles stated in the foregoing excerpts taken from Wharton [supra] are numerous decisions of this court," among them *Thomas* v. *State*, 67 *Ga.* 460; *Holsenbake* v. *State*, 45 *Ga.* 43, 56; *Brown* v. *State*, 105 *Ga.* 640 (31 S. E. 557); *Murray* v. *State*, 43 *Ga.* 256; *Bines* v. *State*, 118 *Ga.* 320 (45 S. E. 376, 68 L. R. A. 33); *Williams* v. *State*, 125 *Ga.* 741 (54 S. E. 661); *Epps* v. *State*, 149 *Ga.* 484 (100 S. E. 568). Mr. Justice Atkinson further said: "The presumption is that the deceased came to his death by natural causes, and the evidence submitted was insufficient to overcome such presumption. The mere fact that the body was found on the floor was consistent with the theory of death by natural causes. Applying the rule that 'In a criminal case the corpus delicti should be established beyond a reasonable doubt, or a conviction should not be had,' the evidence was insufficient. Omitting from consideration the confession of the accused, as it should be, because it was not corroborated, the verdict finding the defendant guilty was unauthorized by the evidence, and the judge erred in refusing a new trial." In *Reynolds* v. *State*, supra, as may be seen from reading the record, the incriminatory evidence was much stronger against Reynolds than against the present plaintiff in error; for the remains of a single-barrel shotgun, proved beyond dispute to belong to Reynolds, was found in the house with the burned bodies of the deceased, his wife and a boy, all of whom had apparently been killed before the burning of the house. This court, in reversing the judgment refusing a new trial, held: "The defendant was convicted upon purely circumstantial evidence which does not connect the defendant with the homicide and does not exclude every other reasonable hypothesis save that of the guilt of the accused. The verdict finding the defendant guilty of murder was not authorized by the evidence." In *Cornwell* v. *State*, supra, in which the facts were very simi-

lar to those in this case, the court held: "The evidence of the guilt of the accused is entirely circumstantial, and is so inconclusive as not to exclude every reasonable hypothesis save that of the defendant's guilt. The court erred in overruling the motion for a new trial." Applying the foregoing principles to the facts of this case, the judge erred in denying a new trial.

*Judgment reversed. All the Justices concur.*