1. The confession of the accused being corroborated by sufficient independent proof to establish the corpus delicti, the evidence warranted the verdict; and the trial court did not err in overruling the general grounds of the motion for new trial.
2. A duly certified public record is admissible in evidence without proof of its authenticity by the person who prepared the record.
3. No error was committed in allowing a State's witness to testify from his own knowledge that dental records similar to a record introduced in evidence were used in the Army to identify deceased soldiers.
4. It is not error to fail to charge the law of alibi, where no written request for such a charge is made, and this defense, if raised, is raised solely by the defendant's statement.
5. The charge of the court on the contentions of the State was not subject to the criticism that it amounted to an expression of opinion and was not supported by the evidence.
6. On a charge of murder, proof that the crime was committed prior to the return of the indictment is sufficient.
 No. 16612. May 12, 1949. *Page 327 
Johnny McVeigh was indicted for the murder of John Frank Stringfellow, the indictment charging that the defendant "in the County of Ben Hill and State of Georgia, on the 21st day of September, 1944, with force and arms, did with malice aforethought kill and murder John Frank Stringfellow by administering, and causing to be administered to the said John Frank Stringfellow, narcotic drugs in such amount and portion to be a deadly poison, from which said narcotic drugs and poison the said John Frank Stringfellow did then and there die, which said drugs were administered for the purpose of killing with malice aforethought the said John Frank Stringfellow."
On the trial, the jury returned a verdict of guilty with a recommendation of mercy. A motion for new trial was filed by the defendant; and this motion, as amended, was overruled. To this judgment the defendant excepted.
The State's case rested upon the following evidence: W. H. Stringfellow testified that he was the brother of John Frank Stringfellow, and the last time he saw his brother alive was on September 12, 1944, at the home of the witness in Phenix City, Alabama, when his brother left in the company of one Dave Walden; that a suitcase exhibited to him was one belonging to his brother, which he had at the time he left the witness's home; that previously, in the office of the Sheriff of Muscogee County, he had examined a skull and some bones, as well as a shoe, and he had identified the skull as being the remains of his brother; that he identified the skull by one filling in an upper tooth on the back side of the skull, this being a tooth the witness had seen filled by a dentist; that he also identified the shoe as being one belonging to his brother; that at the time his brother left the witness's home, he was in the United States Army, was in good health, and was not addicted to any kind of narcotics or drugs; that the witness saw Dave Walden give his brother a shot of narcotics on the day his brother left the witness's home. The witness further testified: "I am positive that the skeleton that I examined at Columbus with Sheriff Howell, and the shoe I examined there, is the skeleton and the shoe of my deceased brother, *Page 328 
John Frank Stringfellow." A skull was exhibited to the witness and he testified that it was the same skull formerly shown him, and that the tooth he identified was still in the skull.
Bernard Charles Hammon testified: that he was a dental surgeon in the Army with the rank of Lieutenant Colonel, stationed at Fort McPherson; that he had been in the Army since 1935; that he was familiar with dental charts used in the Army, and that a photostatic copy of a dental chart exhibited to him was a copy of a dental chart made by dental officers of the Army; that the chart shown him was one made for "Stringfellow, John F., serial number 34836063," and that the chart was one used for a patient, showing a diagnosis and the various treatments, and on the chart there were various symbols showing extractions and cavities in the mouth; that he had never seen nor treated John Frank Stringfellow; that he was stationed in Fresco, California, in 1944, when the dental chart was made, and that he did not know a Major Paul T. Scollard, whose signature appeared on the chart, dated June 21, 1944, and that the witness did not see the chart made; that he first saw photostatic copies of the chart in the office of the G. B. I. in Atlanta, and at that time he examined the chart and a skull. The witness was handed a skull, and then testified: "That is the skull of John Frank Stringfellow. Comparing this skull with the records of the photostat I conclude that this is the skull of John F. Stringfellow, whose serial number is 34836063."
Donald Wetlofer testified that he was Captain and acting Judge Advocate in the United States Army at Fort McPherson; that a "dog tag" exhibited to him was that of John F. Stringfellow, serial number 34836063; that a dental chart exhibited to him was one used in the medical department of the Army, and that this particular chart was made at Camp Croft, South Carolina, shows the soldier's name and serial number, rank and company, his age, race, and native State; that such records are permanent records, kept by the Army at the Records Depot at St. Louis; that the records are kept under guard by the Army, and only those people authorized may have access to them; that this particular record was obtained by the witness and turned over to an officer of the Georgia Bureau of Investigation for the purpose of making photostatic copies of the record, and the officer in turn *Page 329 
had given the witness the original record on the day of the trial; that the original record was sent to him through the mail in response to a telegram; that photostatic copies handed to him were correct copies of the original record.
W. F. Stringfellow, recalled, identified the "dog tag" as being one that his brother, John Frank Stringfellow, gave him at the witness's house.
T. M. Price, employed by the Georgia Bureau of Investigation, testified that a suitcase exhibited to him (and previously identified as belonging to John Frank Stringfellow) was one which he had found in a bedroom occupied by Dave Walden at Cherokee Inn located on U.S. Route 16 in Liberty County.
Albert William Armentrout Jr. testified that his sister married the defendant, and that she lived at 411 E. Magnolia Street in Fitzgerald, Georgia, a portion of the year 1944, but the witness would not say that the defendant ever lived there; that this house is located in Ben Hill County, Georgia; that the defendant and his wife worked at a shipyard in Brunswick in 1944, and would drive back to their home, but the witness did not remember ever having seen the defendant at this house in Fitzgerald except on one occasion in 1944.
E. F. Howell, Sheriff of Muscogee County, Georgia, testified that he made an investigation into the death of John Frank Stringfellow; that he went to where the body was buried; that the grave and skeleton were between Jacksonville and St. Augustine, Florida. The witness identified the skeleton, which he stated he helped get out of the grave, and also a picture made at the scene of the grave. He testified that the grave was full of lime, and there was no headstone or marker on it; that he found the grave in a palmetto thicket, with rotten limbs on top of the grave, and the grave was located in wild country; that the defendant made statements to the witness, which were freely and voluntarily made without any offer of a reward or hope therefor, and these statements were made in the presence of the witness, E. J. Hancock, Sheriff Cruse of Nahunta, Georgia, and the defendant's wife. With reference to the statements, the witness testified: "I carried he (the defendant's wife) into the office there in the courthouse in Nahunta, and McVeigh looked up and said, `Sheriff, you got me,' and says, `you brought the little *Page 330 
woman down here and I am going to tell you about it,' and then he proceeded to tell me that this man was killed in Fitzgerald from a dose of narcotics. I asked how much he gave him, and he said, `two grains of morphine and four tablets of H. M. C. shot in the main line.' I didn't know what he meant. And he said after he gave him that he made a funny noise and he fell. He said they stayed around the house there for some little time and then left, and that Johnny Stringfellow was dead when they left Ben Hill County, and he wouldn't tell Dave Walden because Dave was driving the car and was driving so reckless, and he didn't want to get him any more excited than he was. After I told him we found him, he said that was right. He said that he and Dave Walden had taken him to this place and laid him out and went in to see a man named Head Revels, and that Head got some lime and they come back and buried him, and Head poured the lime on him and went back to some place at St. Augustine, and Head Revels gave them ten $100 bills, and he gave Dave Walden $500 of it. He said he killed him for the money they had promised him, that Head Revels, Godwin Davis, and Joe Allred had promised him; and that Godwin Davis paid $500 and Head $250 and Joe $250. I don't remember that he told me why they killed him exactly. I do remember some conversation that he was to testify in some case in Alabama about some whisky against these three men. He talked to me quite frequently about that case. He did make confessions to me at other times. I couldn't estimate the number of times that he did talk to me about it or confess this crime — on several different occasions. The statements made by him on other times were similar to the statement that I have just related that he made to me. He said it was at Katie's house in Fitzgerald where this morphine was administered. I believe the place he gave was 411 Magnolia Street. That is the best of my recollection — 411 Magnolia Street here in Fitzgerald, Georgia, at Katie's house where Katie lived. He said she was a girl he had been living with. He told me Dave Walden was with him. He stated that a boy by the name of McCord came in, but he didn't think he ever saw him. He did tell me what happened as to the killing, just how it was done. He said he fixed this shot — that he fixed the shot. He said somebody else took a shot. He said they were taking a shot *Page 331 
and said Johnny Stringfellow wanted a joy pop. . . He said he fixed him two grains of morphine and four H. M. C. tablets and shot him in the main line — said he was killing him. He did state that he did die, as a result of that shot. He said he was dead before he left Ben Hill County. He did tell me how he knew he was dead. He said they gave him a little pop after he left Fitzgerald and he checked him to see if he was alive and he knew he was dead. He told me they went toward Rebecca, I believe after leaving Fitzgerald, and from there to St. Augustine, Florida. . . When they reached Florida they said they took him out to this place where they buried him and went in to get a shovel at St. Augustine and to see Head Revels and come back and buried him there." The witness further testified: "I know Dave Walden. He made a statement to me concerning this case. He made that statement in the presence of Johnny McVeigh. They discussed the crime — the killing with us, in the office together and both of them told practically the same story I have just related in this killing. In other words, Dave Walden in the presence of Johnny McVeigh gave me the same statements that Johnny McVeigh had given as just testified by me as to the killing and how and where it took place."
C. W. Peets testified that he was employed by the United States Treasury Department, Internal Revenue, Alcohol Tax Unit; that he was an investigator in 1943 on a case involving Godwin Davis, Joe Allred, and Clarence Revels, and on that occasion obtained a statement from John Frank Stringfellow, and later Stringfellow was sent for by the Government as a witness in that case; that the witness tried to find Stringfellow, but was never able to locate him as a Government witness; that the witness appeared before the grand jury of Ben Hill County as a witness in the case; involving the death of John Frank Stringfellow, and the defendant stated at that time that he shot Stringfellow with dope in a house in Ben Hill County, and pointed out the direction of the house; that the defendant told the witness that Godwin Davis, Joe Allred, and Clarence Revels talked to him about getting hold of John Frank Stringfellow and getting rid of him to keep him from testifying against them in Federal court; that the defendant stated he carried Stringfellow to the house of the defendant's ex-wife and gave him a shot he had *Page 332 
heated over a lamp; that the defendant stated he and Walden rolled Stringfellow in a blanket and carried him from the house and down to St. Augustine and got in touch with Revels and Revels paid them $1000.
Dr. Francis Ward, a medical doctor, testified that morphine in an overdose is poison, and that it is a narcotic drug; that in his opinion four tablets of H. M. C. and two grains of morphine administered to a one-hundred-sixty-five pound man, twenty-seven years old, would be a lethal dose; that a person who is an addict can stand more than one who is not; and that an addict can take two grains of morphine and four H. M. C. tablets without any lethal effect.
The State introduced in evidence the suitcase, identified as belonging to the deceased, a photo of the grave where the skeleton was found, a human skull, in two parts, a certified copy of an indictment against Godwin Davis, Joe Allred, and Clarence Revels, returned in the District Court of the United States, charging the defendants with a conspiracy to violate certain liquor laws of the United States; also, dental charts and a "dog tag." The State also introduced in evidence a written statement, signed by the defendant, and identified by Sheriff E. F. Howell as being a statement the defendant had read, admitted to be true, and then signed. The statement was as follows: "We, Dave Walden and I, went to the Manhattan bar in Phenix City, and there we had a conversation with Joe Allred, Head Revels, and Godwin Davis, and there they agreed to give us $1000 to do away with John Frank Stringfellow, who was a witness against the three people we talked to in Opelika for violation of the alcoholic law. Dave and I got John Frank Stringfellow down at Brunswick, Georgia, and after we had directions from the three named parties last mentioned, we went up to Fitzgerald, Georgia, and while we were there we were at Katie's house. Around 7 o'clock in the evening Dave and I started to give ourselves a shot of morphine and John asked me for one too. I fixed his shot. I melted this by putting a match under the hypo gun. He shot himself in the main line and in a few seconds he said a cuss word and fell over on the bed. He lay there on the bed about 1-1/2 hours, then we put him in the car and drove slowly to Rebecca, and by the time we got to Rebecca he was dead. We then drove from Rebecca *Page 333 
to Tifton and from Tifton to Waycross, then to Nahunta, then Woodbine, and to about 10 miles out of St. Augustine to what is known as Ponte Vedra. We went out the brick road, going about 1/4 miles. We then took John Stringfellow's body out of the car, then we shot him with a 22 pistol that had been stolen from a pawn shop in Brunswick. We wrapped his body in a blanket and put him on the left-hand side of the road. We then went to St. Augustine and stopped at a filling station and called up Mr. Head Revels who is known as Clarence O. Revels. He told us to come to his house. We went and told him what we had. Head Revels got a shovel and we put it in our car. We then went to the body — Revels going in his car. He looked the body over and then returned in about an hour with some lime. We stayed there and dug the hole while he was going for the lime. This was the same hole that we pointed out where the body was found. I saw Head hand Dave the money — $1000 in one hundred dollar bills. There is no doubt in my mind that I know that John Frank Stringfellow was dead before we ever left Ben Hill County."
John D. Dorminy, foreman of the grand jury which indicted the defendant, testified that the defendant appeared before the grand jury and made a voluntary statement with reference to the killing of Stringfellow; that the defendant, as a sworn witness, stated that he and Stringfellow and Walden were together in Fitzgerald at a house in the third ward, and he prepared a shot of narcotics that was unusually strong and gave it to Stringfellow, who made an injection on himself, and in a short while Stringfellow died; that they put a glass over his mouth to see that there was no moisture, and after they knew Stringfellow was dead they put him in a car and made a trip from Fitzgerald to a point near St. Augustine, and there they made a grave and put the body in the grave and poured lime over the body. The witness further testified that the defendant stated that Stringfellow was killed because they wanted to get him out of the way because they thought he was going to turn State's evidence in a case in Alabama, and he and Walden were paid $1000 for killing Stringfellow.
No witnesses testified in behalf of the defendant, but in a statement to the jury the defendant denied any knowledge of the killing of John Frank Stringfellow. He stated that, after he was *Page 334 
arrested in his home near LaGrange, Georgia, he was taken from one jail to another at least nine different times, and the officers tried to get him to tell a bunch of lies against the Phenix City men; that they promised him that, if he would say what they wanted him to say, they would get him off for no more than a year; that for weeks he was not allowed to talk to any one except the officers and was not allowed to see a lawyer; that he was threatened with the electric chair if he didn't say what the officers wanted him to say about the killing of Stringfellow in Georgia; that, after he was taken to Nahunta, the officers brought a skull to him and told him they were going to put him in the electric chair; that after he was put in an isolation cell in Columbus, the officers threatened him with the electric chair unless he testified before the grand jury in Fitzgerald; that he was given dope while in jail; that the officers told him they knew Stringfellow was not killed in Georgia, but if he would say what they made up for him to say against the Phenix City men, they would get him off for no more than a year; that he was not in Fitzgerald at the time it was claimed Stringfellow was killed, but he was working for the J. A. Jones Construction Company at Brunswick, Georgia.
In rebuttal, the State offered four witnesses, three of them officers of the law, and the fourth the clerk of the grand jury which indicted the defendant, and testimony given by some of these witnesses was to the effect that the defendant was never given any dope while in jail; that when the defendant was being taken to testify before the grand jury, he stated that he had killed Stringfellow and Dave Walden's wife, and told where he had buried the woman and why she was killed; that, when the defendant was sworn before the grand jury, he was asked by the clerk why he was turning State's evidence, and he stated, "If I don't get the hot seat I will be lucky."
One of these witnesses testified in detail as to a confession, in which the defendant admitted that he and Dave Walden killed Dave Walden's wife; that they carried the body to the "edge of Florida," and, after stripping the body of clothing, buried it. The witness further testified that the defendant took him to the grave and showed him where the body was buried, and that the witness could not have found the body without the defendant's having pointed out the place of burial. *Page 335 
1. The State's case was based upon the theory that the defendant, Johnny McVeigh, and Dave Walden were employed by Godwin Davis, Joe Allred, and Clarence Revels to murder John Frank Stringfellow; that Stringfellow was a material witness for the Government in a case pending in the Federal court in Alabama against Davis, Allred, and Revels; that on or about September 12, 1944, Stringfellow left Phenix City, Alabama, in company with Dave Walden; that thereafter Walden and the defendant carried Stringfellow to a house belonging to the defendant's wife, and located in Fitzgerald, Georgia, and there the defendant administered to Stringfellow a lethal shot of narcotics for the purpose of killing him; that Stringfellow died as a result of the administration of the narcotics, and Walden and the defendant transported his body to Florida, where they stripped the body of clothing, except for shoes, fired a shot into the head of the corpse, wrapped it in a blanket, and buried it covered with lime in a secluded spot; that the defendant and Walden also murdered Patricia Walden, who was Walden's wife, and buried her body in a grave in the Okefenokee Swamp; that Dave Walden made a plenary confession to both crimes, and led the officers to the grave of Stringfellow; and the defendant made a plenary confession to both crimes and led the officers to the grave of Patricia Walden; that at least one of these confessions was made by Walden and the defendant in the presence of each other.
On the general grounds of the motion for new trial, this case turns upon a consideration of whether the corpus delicti was sufficiently proved. To sustain a conviction of murder, it is necessary that the corpus delicti be proved beyond a reasonable doubt. Lee v. State, 76 Ga. 498; Epps v. State,149 Ga. 484 (100 S.E. 568); Wrisper v. State, 193 Ga. 157
(17 S.E.2d 714).
The Code, § 38-420, provides: "A confession alone, uncorroborated by any other evidence, shall not justify a conviction." However, proof of the corpus delicti is sufficient corroboration of the confession. Daniel v. State, 63 Ga. 339;Paul v. State, 65 Ga. 152; *Page 336 Westbrook v. State, 91 Ga. 11 (2) (16 S.E. 100);Owen v. State, 119 Ga. 304 (2) (46 S.E. 433). But such proof of the corpus delicti may not rest upon a mere extrajudicial confession alone. There must be aliunde proof of the corpus delicti. Smith v. State, 64 Ga. 605; Williams
v. State, 125 Ga. 741 (2) (54 S.E. 661); Clay v. State,176 Ga. 403 (168 S.E. 289).
"In defining corpus delicti Wharton says: `It is made up of two elements: (1) That a certain result has been produced, as that a man has died, or a building has been burned, or a piece of property is not in the owner's possession; (2) that some one is criminally responsible for the result; e.g., on a charge of homicide it is necessary to prove that the person alleged in the indictment to have been killed is (1) actually dead, as by producing his dead body; (2) that his death was caused or accomplished by violence, or other direct criminal agency some other human being.' 1 Whar. Cr. L. (11th ed.), § 347. In 1 Wharton's Criminal Evidence (10th ed.), § 325 d, it is said: `The general rule in homicide is that the criminal agency — the cause of the death, the second element of the corpus delicti — may always be shown by circumstantial evidence. To sustain a conviction, proof of the criminal agency is as indispensable as the proof of death. The fact of death is not sufficient; it must affirmatively appear that the death was not accidental, that it was not due to natural causes, and that it was not due to the act of the deceased. . . It must affirmatively appear that death resulted from criminal agency." Langston v. State, 151 Ga. 388,390 (106 S.E. 903).
"One element of the corpus delicti is just as essential as the other. . . In the absence of extraneous evidence of all elements of the corpus delicti, the proof is insufficient to corroborate the confession." Grimes v. State, 204 Ga. 854
(51 S.E.2d 797).
Applying the foregoing principles to the evidence in this case, was the verdict finding the defendant guilty of murder sustained? Since the confession alone will not suffice, it is necessary to determine whether the corpus delicti has been prima facie established by independent evidence. If so, then the confession might be considered by the jury, in addition to the independent proof, in determining whether the corpus delicti had been satisfactorily proven. Grimes v. State, supra. *Page 337 
Unquestionably, the first element of the corpus delicti; that is, that the person alleged to have been killed is actually dead, was sufficiently established by independent evidence. The testimony of the brother of the deceased alone, if believed by the jury, was sufficient for this purpose.
We think, also, that the second element of the corpus delicti, that is, that death was due to a criminal agency, was sufficiently established by independent evidence, although resting upon rather meager circumstantial evidence. The evidence showed that the skeleton of a human being was found buried in a palmetto thicket, with no marker of any kind at the grave, and with rotten limbs piled on top of the grave. The grave was located in wild country, and was full of lime. There were no clothes in the grave, but a portion of a shoe and a blanket were found with the skeleton. The manner of burial, the place of burial, the condition of the grave, and the condition of the body all tend to show that someone was interested in removing the deceased from society and doing away with the body in such a manner that it could never be located, and, if located, in such a manner that the body would have become consumed by lime and thus rendered unrecognizable or unidentifiable. These circumstances are incompatible with the theory that the death of the deceased was accidental, or due to natural causes, or the act of the deceased. Compare Wrisper v. State, 193 Ga. 157
(17 S.E.2d 714); Buckhanon v. State, 151 Ga. 827 (108 S.E. 209).
We might further mention that Walden, an accomplice, made a plenary confession, in the presence of the defendant, in which he gave an account of the homicide similar to an account then given by the defendant; that Walden led the officers to the grave where Stringfellow's body was buried; and that the defendant led the officers to the grave of another person, whom both Walden and the defendant admitted having murdered and buried.
Counsel for the plaintiff in error urge that there is still another element necessary to be proved in establishing the corpus delicti; that is, that the crime was committed as charged in the indictment, citing in support of this contention Warren v.State, 153 Ga. 354 (112 S.E. 283), Graham v. State,183 Ga. 881 (189 S.E. 910), and Grimes v. State, supra, the latter two cases being *Page 338 
ones in which a statement from the Warren case was quoted with approval. A cursory examination might lead one to the conclusion that the Warren case supports counsel's contention, but we think that a careful analysis of that decision will reveal that the import of the ruling was otherwise. The Warren case was one depending wholly upon circumstantial evidence, no confession being involved. The court there ruled in the second headnote: "To sustain a conviction in a case of homicide, it is essential, to prove the corpus delicti; that is, first, that the person alleged in the indictment to have been killed is actually dead, and second, that the death was caused or accomplished by violence, or other direct criminal agency of some other human being, that is, it was not accidental, nor due to natural causes, nor to the act of the deceased; and that the accused caused the death by one ormore of the means charged. (a) The evidence was insufficient to establish the second element of the corpus delicti, and that the accused was guilty as charged." (Emphasis ours.) An analysis of this ruling will reveal that the court actually held that it is necessary to prove the corpus delicti (and then set forth the first and second elements of the corpus delicti), and in addition thereto, it is necessary to prove that the accused committed the crime by one or more of the means charged. If the first paragraph of the headnote might lead one to conclude that the court ruled that proof of the means charged was a part of the corpus delicti, the subparagraph of the headnote should clarify the confusion. The court did not rule that the evidence was insufficient to establish the second and third elements of the corpus delicti, but ruled that the evidence was "insufficient to establish the second element of the corpus delicti, and that the accused was guilty as charged." It seems clear, therefore, that the court was dealing with the corpus delicti as containing two elements only, and was dealing with proof of the corpus delicti and proof of death by the means charged separately.
If there be any doubt about the true import of the headnote of this decision, we think that the body of the opinion should dispel it. The court held: "Before a conviction can be legally had on the charge of murder, it is essential, in proving the corpus delicti, to show that the person alleged in the indictment to have been killed is actually dead, and that the death was caused or *Page 339 
accomplished by violence, or other direct criminal agency of some other human being." The court then cited authority for this statement, and further held: "To authorize a conviction in this case, it was necessary for the State to prove beyond a reasonable doubt that Lucinda Underwood was dead, and that she was killed by being choked or strangled with the hands of the defendant, or by being smothered or suffocated by having her head wrapped up with a quit by him, or by his burning her with fire. And the evidence being wholly circumstantial, the proved facts had not only to be consistent with the hypothesis save that the defendant caused her death by one or more of such methods, but had to exclude every other reasonable hypothesis save that of her [his] guilt as charged."
The latter quotation is a correct statement of the law, it undoubtedly being true that the evidence must prove beyond a reasonable doubt that the defendant caused the death by the means charged; but we think it is apparent that the court was dealing with this phase of the case separately from the question of proof of the corpus delicti, and the elements thereof, as defined by the court. Finally, the court said: "A reversal of the overruling of the motion for a new trial must be had, for the reasons that the evidence was not sufficient to show, beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis, that the death of Lucinda Underwood was caused by a criminal agency, and was not the result of accident, or disease, or of her own act; and that, considering the testimony of Ida Cunningham as true, it wholly fails to prove the necessary elements of criminal agency of the corpus delicti, and fails to prove that the defendant caused the death of Lucinda by one or more of the means charged in the indictment." Again, it is apparent that the court was dealing with the sufficiency of the proof of the second element of the corpus delicti as one thing, and the sufficiency of the proof that death was caused by one or more of the means charged as an entirely different proposition.
Accordingly, it is our opinion that the purport of the ruling in the Warren case was to the effect that the evidence, in order to sustain a conviction, must establish the two elements of the corpus delicti; and in addition thereto, there must be evidence sufficient to prove beyond a reasonable doubt that the accused *Page 340 
committed the crime in the manner charged in the indictment.
The Warren decision is not by a full bench, and anything in the decision contrary to the construction we have placed upon it is expressly disapproved as being unsound and contrary to full-bench decisions of this court, holding that the elements of the corpus delicti are (1) death, and (2) that the death was due to a criminal agency. See Langston v. State, supra. As stated in 41 C. J. S. 16, § 312, "The manner and means in and by which the crime was committed are not elements of the corpus delicti." The Graham and Grimes cases, supra, citing the Warren case with approval, are not controlling on the question here raised, for both of those cases turned upon a determination that the evidence failed to establish the criminal agency (the second element of the corpus delicti), and neither case dealt with the point here considered.
There being evidence, independent of the confession, sufficient to prove the two essential elements of the corpus delicti, such independent proof, in corroboration of the confession, was sufficient to support the verdict finding the defendant guilty. Accordingly, since it is unnecessary that a confession be corroborated by independent proof in all its details and particulars (Holsenbake v. State, 45 Ga. 43), and since a confession is direct evidence and not circumstantial evidence, the confession was sufficient to prove the manner and means of death as charged in the indictment, without independent corroborating evidence, just as it is the rule that "once the requirement of the corpus delicti is met, the confession of the accused is available to identify the person confessing as the criminal agent." 26 Am. Jur. 425, § 383; Cochran v. State,113 Ga. 726 (7), 736 (39 S.E. 332). Any other rule would have the effect of completely annihilating the long-established rule, laid down in many decisions of this court, to the effect that proof of the corpus delicti is sufficient corroboration of a confession, and such evidence will sustain a conviction of murder.
(a) Special grounds 5 and 6 contend that the State failed to prove the venue. This contention is based upon the ground that the State relied upon the confession alone for such proof. For the reasons given in the immediately preceding paragraph of this opinion, this contention is without merit. *Page 341 
In addition to the accused's confession, in which he stated that he killed the deceased at the home of his wife, Katie, located at 411 E. Magnolia Street, in the City of Fitzgerald, Ben Hill County, Georgia, there was evidence to the effect that 411 E. Magnolia Street in the City of Fitzgerald, Ben Hill County, Georgia, was the property of the defendant's former wife, Katie McVeigh. Compare Dowdell v. State, 200 Ga. 775
(38 S.E.2d 780) (where the accused pointed out to officers the place where the shooting occurred, and a witness testified that this location was in the county where the trial took place), andDavis v. State, 66 Ga. App. 877 (4), 880 (19 S.E.2d 543). The evidence warranted the verdict.
2. Special ground one complains of the admission in evidence of a photostatic copy of an original Army health record, containing a dental chart. The objection urged to this evidence was that it had not been proven or identified by Paul T. Scollard, the person purporting to have prepared the record, and none of the witnesses who testified with reference to the chart had seen it prepared.
In Pressley v. State, 205 Ga. 197 (3) (53 S.E.2d 106), this court held: "A health record of its enlisted personnel, kept by the United States Navy, is a public record, but, in the absence of an admission in open court that a document offered as such is in fact the original record, its contents can be proved only by a duly certified copy thereof."
There was no objection to the evidence in the instant case upon the ground that it was not duly certified as required by law, and such a question is not raised in the brief of counsel for the plaintiff in error. The brief of evidence fails to disclose whether the photostatic copy was duly certified, containing only an abstract of material portions of the chart. Assuming, however, that it was not duly certified, as some evidence in the brief of evidence would indicate, there was no error committed in admitting the chart, since no valid objection was urged to its admission upon this ground. Irrespective of whether such evidence was of probative value, other evidence introduced amply proved the first element of corpus delicti, that is, the death of John Frank Stringfellow.
Being a public record, the evidence was admissible without *Page 342 
proof of its authenticity by the person who prepared the record, such records being sufficiently proved by a certified copy thereof; and the trial judge did not err in admitting the evidence over the objection urged.
3. The trial judge did not err in allowing a witness for the State, a Lieutenant Colonel in the United States Army, to testify that he knew of his own knowledge that dental records similar to those introduced in evidence were used to identify deceased soldiers.
4. The trial judge did not err in failing to charge the law of alibi, no written request for such a charge having been made, and such a defense, if raised, being raised only by the defendant's statement. Watson v. State, 136 Ga. 236 (5) (71 S.E. 122).
5. Special ground four complains of the following charge of the court: "The State contends that the alleged confession has been corroborated. In the first place, the State contends that the alleged confession was made freely and voluntarily on more than one occasion, and was made without the slightest hope of reward or the remotest fear of injury, and the State further contends that the alleged confession was corroborated by the alleged discovery of the skull and bones of the head of the deceased, and that the defendant admitted that the place where the alleged skull and bones were concealed, were admitted in the statement made by the defendant, that that was the skull and bones of the deceased. Now that is the contention on the part of the State."
This charge, in which the trial judge was merely charging the contentions of the State, did not amount to an expression of opinion as to what had been proved, and it is not subject to the criticism that there was no evidence upon which to base such a charge.
6. Finally, it is contended that there was no evidence showing the date when the alleged crime was committed. This contention is without merit. While the evidence fails to disclose the exact date when the crime occurred, there is ample evidence showing that the crime was committed prior to the return of the indictment on April 12, 1948. The written confession of the accused was dated prior to this date. As to the crime of murder, there is no statute of limitations; and proof that the crime was committed prior to the return of the indictment is sufficient.
Judgment affirmed. All the Justices concur. *Page 343